(No. 29850.

WILLIAM BYRUM ROUTT *et al.*, Appellants, *vs.* EDWARD J. BARRETT, Secretary of State, *et al.*, Appellees.

*Opinion filed January 22, 1947—Rehearing denied March 17, 1947.*

SHARL B. BASS, and ALFRED KAMIN, both of Chicago, and DRACH & HOWARTH, of Springfield, for appellants.

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, RAYMOND S. SARNOW, and JAMES C. MURRAY, all of Chicago, of counsel,) for appellees Edward J. Barrett *et al.*; WILLIAM J. TUOHY, State's Attorney, (JACOB SHAMBERG, and GORDON B. NASH, of counsel,) all of Chicago, for appellees Michael J. Flynn *et al.*

Mr. JUSTICE MURPHY delivered the opinion of the court:

On May 22, 1946, pursuant to the power given by section 8 of article V of the constitution, the Governor issued a proclamation calling an extraordinary session of the General Assembly to convene May 24, 1946. The purpose, as stated in the call, was in general to enact a law or laws and to amend existing laws to provide for payment of compensation to persons who served with the military or naval forces of the United States in the recent war with Germany, Italy, Japan and other nations; to provide for the issuance and sale of bonds of the State and for taxes to pay the principal and interest of the bonds sold. During such special session Senate Bill No. 1, hereinafter referred to as the Bonus Act, was adopted and on June 14 it received the approval of the Governor. The law provided that it was to be submitted to a vote at the general election of November 5. Ill. Rev. Stat. 1946 Supplement, p. 40.

Plaintiffs, who are veterans of World War II and presumably entitled to benefits under the act, are also citizens and taxpayers of this State. Acting for themselves in such capacities and for and on behalf of others similarly situated, they obtained permission of the circuit court of

Cook county to file a suit to enjoin Edward J. Barrett as Secretary of State, Arthur C. Lueder as Auditor of Public Accounts, and Conrad F. Becker as State Treasurer, from dispersing public funds for the payment of expenses incurred in submitting the law to the electorate. The application to sue the State officers was made pursuant to the statute. (Ill. Rev. Stat. 1945, chap. 102, par. 14.) The county clerk of Cook county, members of the board of election commissioners and the county treasurer of said county were also named as defendants. Plaintiffs sought to enjoin them from expending county funds in submitting the law to a vote. Plaintiffs moved for a temporary injunction. The State and county officers moved to dismiss the complaint. The motion for a temporary injunction was denied and the motions to dismiss were sustained. Plaintiffs filed a notice of appeal to this court.

The cause was not docketed in this court in time to have it submitted for decision at the September term. Plaintiffs petitioned for an order, which if it had been allowed, would have taken the cause from the usual course and made it possible to submit it for decision during that term. The obvious purpose of expediting it was to obtain a decision before the November election, so that if it should be held that plaintiffs were entitled to injunctive relief, the writs could issue before the election. It is well settled that courts have no power to prevent the holding of an election at the suit of a taxpayer. (*Daly* v. *County of Madison,* 378 Ill. 357; *Fletcher* v. *City of Paris,* 377 Ill. 89; *Payne* v. *Emmerson,* 290 Ill. 490.) Courts cannot pass on purely political questions. The prayer of the petition was denied but in doing so it was recognized that plaintiffs' amended complaint contained allegations that they were citizens and taxpayers of this State and that as such they had rights that might be affected by the Bonus Act over which a court of equity could exercise jurisdiction. That these rights would be preserved even though

the decision was not rendered until after the November election. Since the cause was submitted, parties have filed an authenticated copy of the proclamation of the Governor declaring that the act received a majority of the votes as required by law and that it is now a law of this State and in full force and effect. When the decree of the trial court was entered, the statute had not received affirmative action of the voters to make it a law, but plaintiffs, in asserting their claim, urged the same grounds which are now presented in this court. The amended complaint and the motions to strike presented the questions that are now urged on this appeal. Under the circumstances, it would be futile to remand the cause to the trial court so that the decree would post-date the election of November 5.

Soon after the conclusion of World War I, a law was adopted by a vote of the people which directed payment of compensation to the veterans of that war. Several of the sections of that act are substantially the same as the provisions of the present act. The validity of the prior act was sustained in *Hagler* v. *Small*, 307 Ill. 460. The questions passed upon in the former case are not re-presented here.

The Bonus Act is divided into four articles. The first prescribes who may be beneficiaries and receive compensation. It provides that the State borrow $385,000,000, or such part as may be needed, to pay such compensation. Bonds are to be issued in series and dated and sold as needed. Each bond is in the denomination of $500 or some multiple thereof and payable within 25 years from its date. Provision is made for redemption of said bonds. The bonds are to bear interest, payable annually at the rate of not more than 2 per cent per annum.

The second article of the act contains three sections and purports to amend the Illinois Horse Racing Act as amended. The amendments proposed make provision for the imposing of a privilege tax upon those who are licensed

under the Horse Racing Act to conduct and operate racing meets. The third article purports to amend the Cigarette Tax Act by imposing a tax upon the business of those engaged in sale and distribution of cigarettes. The fourth article provides for a third source of revenue with which to pay the bonds. It directs that a direct annual tax shall be levied each year while any of the bonds remain unpaid, the amount of such levy to be fixed after making allowance for the moneys received from other sources of revenue for such purpose. Article 4 also contains provisions prescribing the form of ballot and the directions for submitting it to an election and the notice to be given. The scheme of raising revenue to pay the bonds assumes that the taxes derived from the Horse Racing Act and the Cigarette Act shall be the primary source and that the general property tax shall be secondary.

Plaintiffs' first contention raises a question as to whether the proposition directed by the Bonus Act to be submitted to the people was submitted in violation of section 18 of article IV of the constitution. The constitutional provision referred to deals with indebtedness of the State and the means of paying it. It directs that the General Assembly shall make such appropriations as may be necessary to meet the ordinary and contingent expenses of State government covering a certain specified time. Provision is made for meeting casual deficits or failures in revenue with the limitation upon the power to supply such deficiency in that it shall not exceed $250,000. As to other debts, it provides that "no other debt, except for the purpose of repelling invasion, suppressing insurrection, or defending the state in war, * * * shall be contracted, unless the law authorizing the same shall, at a general election, have been submitted to the people, and have received a majority of the votes cast for members of the general assembly at such election. The general assembly shall provide for the publication of said law for three months at

least before the vote of the people shall be taken upon the same; and provision shall be made, at the time, for the payment of the interest annually, as ·it shall accrue, by a tax levied for the purpose or from other sources of revenue; which law, providing for the payment of such interest by such tax, shall be irrepealable until such debt be paid: *And, provided, further,* that the law levying the tax shall be submitted to the people with the law authorizing the debt to be contracted."

Section 4 of article 4 of the Bonus Act provided that the Secretary of State should cause publication of the act to be made once each week for three months at least before the election and that the publication should appear in at least two daily newspapers, one of which was published in the city of Springfield and one in Chicago.

Section 3 of article 4 of the act provides that "The proposition of contracting the debt of $385,000,000.00 and issuing bonds to that amount and of levying and imposing taxes sufficient to pay the interest on such bonds as it accrues and to pay off and discharge the principal of such bonds within 25 years from their date in accordance with this Act, shall be submitted to the People of the State of Illinois at the general election to be held on Tuesday next after the first Monday of November, A.D. 1946, on a separate ballot to be in substantially the following form."

The form of ballot prescribed contained the heading: "Service Recognition Ballot" and the proposition directed to be printed on the ballot was as follows:

"Shall the State of Illinois contract a debt of $385,000,-000.00 and issue bonds to that amount maturing within 25 years after their date, pursuant to 'An Act to provide payment of compensation to certain persons who served with the military or naval forces of the United States, prior to or in the recent war with Germany, Italy, Japan and other nations, or to their survivors, and to authorize the issuance and sale of bonds of the State of Illinois to

make said payments and to provide for the payment of the principal of and interest upon said bonds by a direct annual tax and by taxes levied and imposed by amending Sections 6, 10 and 10a of the "Illinois Horse Racing Act," filed June 13, 1927, as amended, and by taxes levied and imposed by amending Sections 2, 3 and 29 of the "Cigarette Tax Act," approved June 2, 1941, as amended,' enacted by the Sixty-fourth General Assembly, at the first special session thereof, which Act levies and imposes the following taxes for the purpose of paying the principal of, and interest upon, such bonds:

1. A tax at the rate of 4% of the total of pari-mutuel wagers plus one-half of the breaks upon licensees of horse racing meetings;

2. A tax at the rate of one-half mill per cigarette upon persons engaged in business as distributors of cigarettes;

3. A direct annual tax upon real and personal property for such amount as shall be necessary to pay the interest annually, as it shall accrue, on all bonds issued under the provisions of said Act and also to pay and discharge the principal of such bonds at par value, as such bonds fall due; provided, however, that if money from other sources of revenue has been appropriated and set apart for the same purpose for which said direct annual tax is levied and imposed the appropriate officers shall in fixing said rate of said direct annual tax make proper allowance and reduction for any money so appropriated and set apart from other sources of revenue?" To the right of said proposition, enclosed in appropriate blocks were the words "Yes" and "No," and to the right of each of said words was a place for the voter to express his preference.

Plaintiffs contend that the words of the constitutional provision "unless the law authorizing the same shall, at a general election, have been submitted to the people," requires that the proposition to be printed on the ballot should call for a vote upon the acceptance or rejection of

the law. It will be observed that section 3 of article 4 of the act and the form of ballot prescribed direct that the vote shall be on the question, "Shall the State of Illinois contract a debt of $385,000,000.00?"

In *Mitchell* v. *Lowden,* 288 Ill. 327, the validity of a bond issue of $60,000,000 for road purposes was involved. The question presented here was not directly involved in that case but the conclusions reached on the questions submitted are explanatory of the meaning of the constitutional provision. One of the contentions advanced was that a law authorizing publication of the bond issue had to be separated from the provisions authorizing publication of the act. It was held that such contention was without merit, that the General Assembly could provide for the publication of the act in the act itself by separate resolution or by another independent law. A further objection made was that section 18 of article IV of the constitution required that the law authorizing the debt to be contracted and the law authorizing the levy of a tax to pay the indebtedness should be separated. Such contention was rejected. It was said: "Since provision for the payment of interest must be made at the same time as provision for incurring the debt, the natural way would be to include both in one act; but whether contained in one act or not, the constitution requires all to be submitted to the people at the same time."

The contention made requires consideration as to whether there is any substantial difference between the meaning of a proposition to be voted upon which says "Shall an act of the General Assembly entitled 'An Act',", etc., (which authorizes the creating of a debt) become a law, and a proposition which says "Shall the State of Illinois contract a debt of $385,000,000.00 and issue bonds to that amount maturing within 25 years after their date, pursuant to 'An Act'," etc., (which act authorizes the creating of a debt.) If there is no difference, then the

constitutional mandate was complied with in this case. The purpose of the constitutional provision was to place a limit on the power of the General Assembly to borrow money on the credit of the State. Before a debt such as the one provided for in the Bonus Act could be created, the General Assembly had to adopt a law which necessarily had to include the purpose for which the debt was to be incurred, the time and terms of payment, the rates of interest and other provisions incidental to giving effect to the law. But the primary purpose of requiring a vote of the people was to determine whether they approved the incurring of a debt for the particular purpose stated in the law. It is not conceivable how an elector could be misled by the language used in the form of ballot prescribed in the act. It would be hypercritical to hold that the submission of a question as to whether the debt provided for in the law should be contracted was not in fact a submission of the law which proposed the incurring of the debt. The contention is without merit.

The next question presented is as to whether the proposition prescribed for the ballot violated section 18 of article II of the constitution. This constitutional provision is that all elections shall be free and equal. In applying this, it has been held that the vote of every qualified elector shall be equal in its influence with that of every other one, (*People ex rel. Breckon* v. *Board of Election Comrs.* 221 Ill. 9;) that two or more questions which are separate and unrelated cannot be combined into a single proposition for submission to a vote. It is said that such practice prevents the elector from giving a free and equal expression of preference as to each proposition. (*People ex rel. Hall* v. *Bopp, ante,* p. 80; *O'Connor* v. *Board of Education,* 288 Ill. 240.) The converse has been held that where a proposition submitted does not contain separate and unrelated questions, the ballot does not violate the constitu-

tional provision. *People ex rel. Wangelin* v. *Baltimore and Ohio Southwestern Railroad Co.* 372 Ill. 38.

What was the nature of the question which the General Assembly was required by section 18 of article IV of the constitution to submit to the electorate in voting on the Bonus Act? It will be observed that, except for the last proviso, no mention is made in reference to submitting "the law levying the tax" to a referendum. But the proviso directs "that the law levying the tax shall be submitted to the people with the law authorizing the debt to be contracted." This would imply at least that the ballot must contain some reference to the law levying the tax so that the elector would have information as to the source of the revenue with which the interest on the debt was to be paid. It will be observed that section 18 directs that "at the time,"—that is, when the law is enacted authorizing the debt,—the General Assembly shall provide for the levying of a tax for the payment of interest. Thus, the two acts are required to be provided for at the same time and the proviso requires that the law levying the tax and the law authorizing the debt shall be submitted together. There is nothing in the language used to indicate that it was intended that the law levying the tax and the law authorizing the debt should be submitted as two separate and unrelated propositions. The law levying the tax was an incident of the law creating the debt, and the General Assembly having knowledge of the fiscal affairs of the State, selected the source from which the revenue is to come to pay the interest on the debt. If the elector disapproves the incurring of a debt for that purpose to be paid from such source, he votes against the law imposing the debt. The proposition as printed on the ballot embodied but one question and the cases relied upon by plaintiffs have no application.

Plaintiffs contend that the proposition as stated on the ballot was deceptive and misleading, in that it failed to

specify that the tax to be levied for the benefit of the bonus fund was additional to a tax already imposed upon the business or occupation which was being taxed. Aside from the amendment to the Illinois Horse Racing Act (Ill. Rev. Stat. 1945, chap. 8, par. 37a *et seq.*) that statute provided that every person conducting a racing meet, as that term was defined in the act, should pay a license fee. It further provided that such licensee should pay a tax of 2 per cent of all moneys wagered each day of a racing meet. The amendment of section 10a of the Horse Racing Act, as amended in article 2 of the Bonus Act, retained the 2 per cent tax and provided that "in addition to any other license fee or tax imposed by this act, a tax of 4% of the total of all moneys wagered each day of a racing meet, plus one-half of the breaks is hereby imposed upon every person, association, corporation or trust for the privilege of conducting horse racing meetings under the provisions of this Act." Section 6, of the Horse Racing Act, as amended in article 2 of the Bonus Act, provides that "Of the moneys received by said Board under the provisions of this Act that part representing the tax of four per cent (4%) of the total of all moneys wagered plus one-half the breaks shall be paid by it into the Service Recognition Bond Interest and Retirement Fund in the State Treasury." The remaining 50 per cent of the breaks was to be paid into the State treasury into a special fund to be known as the Agricultural Premium Fund.

The Cigarette Tax Act (Ill. Rev. Stat. 1945, chap. 120, par. 453.1 *et seq.*) formerly imposed a tax of 1 mill per cigarette sold by every person engaged in the business as a distributor of cigarettes. The 1-mill tax was payable to the Emergency Relief Fund in the State treasury. The act as amended by article 3 of the Bonus Act retained the 1-mill tax and directed that an additional tax of ½ mill per cigarette should be imposed upon the person engaged in the business as a distributor of cigarettes. By the

amendment to section 29 of the Cigarette Tax Act, the 1-mill tax continues to be paid into the Emergency Relief Fund and the ½-mill tax goes to the Service Recognition Bond Interest and Retirement Fund provided for in the Bonus Act.

In making the contention in reference to the failure of the ballot to disclose that the tax proposed was an additional tax to one already in existence, plaintiffs rely upon cases such as *People ex rel. McClusky* v. *Alton and Eastern Railroad Co.* 359 Ill. 440; *People ex rel. Forsythe* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 327 Ill. 611. The question involved in those cases pertained to a county tax levied pursuant to a vote of the people. Section 8 of article IX of the constitution prohibits counties from levying a tax in excess of 75 cents per hundred dollars valuation "unless authorized by vote of the people of the county." It was held that in submitting the proposition it was necessary that the ballot contain the information that the tax to be voted upon was in excess of the amount allowed by the constitutional provision. There is no similarity between the facts of those cases and the instant case upon which the principle announced there can be applied in this action.

Plaintiffs further contend that the ballot was ineffective in that the proposition printed thereon did not contain the information that the law levying the tax was irrepealable. Plaintiffs raise another question in reference to the power of the General Assembly to make the law levying the tax irrepealable, which will be discussed later. Reference will be made to the failure of the ballot to contain information relative to the irrepealability of the law in that discussion.

It is urged that the language of the proposition as stated on the ballot was misleading and that it furnished a basis for an inference that the law levying the tax would prevail and a levy made even though the law au-

thorizing the debt should not be approved. What has been said in reference to the law levying the tax being related to a part of, and as an incident of, the law that authorized the debt has application here. The language of the proposition as directed by the act to be printed on the ballot was clear and direct, and gave the elector information as to the subject on which he was to express his preference. It is not subject to the criticism directed against it. The cases cited by plaintiffs, *People ex rel. Black* v. *Sullivan,* 247 Ill. 176, and *Harvey* v. *County of Cook,* 221 Ill. 76, have no application to this point.

The contention that the direction contained in the Bonus Act, that the proposition to be voted upon should be on a separate ballot, was an attempt to amend section 16-7 of the Election Code, which provides that such measures submitted to the people of the State shall appear on the face of the regular ballot where the names of State officers are printed, is without merit. There is nothing in the constitution which restricts the General Assembly from providing that a certain public measure shall be submitted in a form different from that already prescribed for the submission of such measures by section 16-7 of the Election Code. It has the authority to direct that it shall be by separate ballot. It is well settled that when the law authorizing the submission of a public measure to a vote provides the form of ballot to be used, which directions are at variance from those contained in the Election Code, such special law shall be followed rather than the provisions of the code. (*Sanders* v. *Township of Salem,* 385 Ill. 362; *People ex rel. Burkholder* v. *Peoria and Eastern Railway Co.* 375 Ill. 197; *People ex rel. Sandberg* v. *Grabs,* 373 Ill. 423.) The direction of the act, that the proposition to be voted upon should be on a separate ballot, was not in any sense an attempt to amend the provisions of the Election Code.

We are next concerned with plaintiffs' objection that the irrepealable clause contained in the act violates constitutional provisions. Section 6 of article 4 of the act contains the following sentence: "The provisions of this Act for the payment of the principal of said bonds at maturity and of the interest thereon annually, as it shall accrue, by the several taxes which have been levied and imposed herein for said purpose, shall be irrepealable until such debt and interest be paid in full, and for the making of such payments the faith of the State of Illinois is hereby pledged." It will be recalled that section 18 of article IV of the constitution directs that, at the time a law is enacted authorizing a debt, provision shall be made for the payment of the interest annually as it shall accrue, by a tax levied for that purpose or from other sources of revenue, "which law, providing for the payment of such interest by such tax, shall be irrepealable until such debt be paid."

Plaintiffs contend that the constitutional provision pertaining to irrepealability was limited to the law that levies the tax to pay the interest and that by including the law which levied the tax for the payment of the debt the constitutional provision was violated. In aid of such contention, they invoke the principle which finds support in the law that a General Assembly cannot bind its successors unless authorized by the constitution. (*People ex rel. City of Chicago* v. *Barrett,* 373 Ill. 393; *People ex rel. Eitel* v. *Lindheimer,* 371 Ill. 367; *State* v. *Griffith,* 135 Ohio St. 604, 22 N.E. 2d 200; *Boswell* v. *State,* 181 Okla. 435, 75 Pac. 2d 940; *State* v. *Executive Council of State,* 207 Iowa, 923, 223 N.W. 737; Cooley's Constitutional Limitations, 8th ed. vol. 1, p. 246.) Defendants argue that the words "which law" in the constitutional provision refer to the law levying the tax to pay the debt as well as the law which imposed the tax to pay the interest on

the debt. This is a strained construction, for that which follows the words "which law" clearly indicates that the law which was to be made irrepealable was the law "providing for the payment of such interest."

There was no provision in the constitution of 1818 that limited the power of the General Assembly to borrow money on the credit of the State. History discloses that the legislatures, acting without any constitutional restraint on their power, contracted debts and engaged in a gigantic scheme of borrowing money for the construction of internal improvements. It proceeded to such an extent that the credit of the State was greatly impaired and heavy burdens of taxation were imposed on its people. (*Law* v. *People ex rel. Huck*, 87 Ill. 385.) Profiting by the lessons taught by such experience, the makers of the constitution of 1848 inserted section 37 of article III. Except as to the amount for which the General Assembly may contract debts to meet casual deficits or failures in revenue, section 18 of article IV of the present constitution is identicle with section 37 of article III of the constitution of 1848. Since 1870, the General Assembly has, on many occasions, enacted laws authorizing the creating of a debt for some public purpose and the people have generally given approval. The practical operation of such a law is that when it has been approved by the electorate, the State, acting through its duly authorized agencies, sells the bonds of the State and thus the holder of the bond becomes the creditor of the State. In making his investment, the purchaser of the bond has the right to rely upon the ability of the State to pay the bond according to its terms, and he may look to the law which authorized the debt. Undoubtedly the people's approval of the law is an expression of the good faith on which the money is borrowed.

When the General Assembly enacted the Bonus Act it exercised all the power it possessed under the constitution

to create the debt, but the law authorizing the debt was ineffective until it had approval of the people. If the General Assembly did not have the power to make the statute effective as a law, then how can it have the power to repeal the law which the people have made effective by their vote? There is no theory under our form of government where a legislature can override the voice of the people on such a matter. The law thus approved by the vote of the electorate is not the same as a constitutional amendment approved by the people, but it must be said it bears some of the same earmarks of sanctity as far as irrepealability by the General Assembly is concerned.

The question here is limited as to the power of the General Assembly to repeal the provisions of the law in reference to the debt and if, as we hold, it had no power to repeal such a law, then the inclusion of the irrepealability provision of the Bonus Act was merely a statement of a pre-existing limitation on the power of the General Assembly. We are not concerned at this time with the power which a General Assembly may exercise to amend or add to a law which has been adopted by the people authorizing a debt, which amendments are limited to the supplying of deficiencies in the application of the law to the purpose for which it was enacted. No future General Assembly has the power to repeal the law so as to destroy the policy enacted in the Bonus Act for the payment of compensation to veterans. It cannot repudiate the debt or do anything which jeopardizes the good faith the electorate has pledged by approving the law to create the debt. The purchaser of the bond is entitled to rely on such expression of faith.

It is contended that the proposition as stated in the ballot should have included the information that the laws levying the tax were irrepealable. The form as given supplied the information to the elector as to the source from which the revenue was to come for the payment of

the debt and interest. That was sufficient to advise him that the faith of the State was proposed to be pledged to the payment of the debt and interest from the sources of revenue specified in the proposition.

The next contention is that the irrepealability feature as applied to the privilege tax levied under the Illinois Horse Racing Act binds future General Assemblies on a matter of public policy. We will not stop to discuss the character of the tax to be collected on pari-mutuel betting conducted at horse racing meets licensed under the Illinois Horse Racing Act. The public policy of a State is to be found embodied in its constitution and its statutes, and when these are silent on the subject, in the decisions of its courts. The public policy of the State, when not fixed by the constitution, is not unalterable but varies from time to time to meet changing legislation and any action which, in the absence of legislation, has been held by the courts to be contrary to the public policy of the State, ceases to be contrary thereto when the act is expressly authorized by legislative enactment. (*People* v. *Monroe*, 349 Ill. 270; *People ex rel. Franchere* v. *City of Chicago*, 321 Ill. 466.) When the General Assembly adopted the Illinois Horse Racing Act permitting pari-mutuel betting, that character of wagering ceased to be contrary to the public policy of the State. So that when the General Assembly proposed by the Bonus Act to levy a privilege tax upon that character of wagering and at the same time declared such act to be irrepealable, it was not taxing a privilege which was contrary to the public policy of this State.

It is claimed that there is no just distinction between horse racing and harness racing, and that when a tax was imposed upon pari-mutuel betting under the Illinois Horse Racing Act it was an unjust discrimination in favor of those who engage in harness racing. An act approved July 17, 1945, known as the Illinois Harness Racing Act (Ill. Rev. Stat. 1945, chap. 8, par. 37s *et seq.*,)

authorizes pari-mutuel betting at harness racing meets and provides for a license fee and levies a tax of 2 per cent of all moneys wagered each day at such a meet. In general, it may be said that the Harness Racing Act and the Illinois Horse Racing Act bear a great deal of similarity but that does not make the subjects which are under legislative control the same. The legislature had the power to determine that harness racing should be controlled by one act and horse racing by another. The matter of classifying the objects or activities that may be subject to legislative control is for the legislature and not for the courts.

Section 1 of article IX of the constitution requires that taxation shall be by general law uniform as to the class upon which it shall operate. The court has adhered to the doctrine that this provision means uniformity as applied to a class. The constitution does not prohibit the classification of property and taxpayers into different classes. *People ex rel Toman* v. *Olympia Fields Country Club,* 374 Ill. 101; *The Hub* v. *Hanberg,* 211 Ill. 43.

The contention is made that the inclusion of article 2, which amends sections 6, 10 and 10a of the Illinois Horse Racing Act, and article 3, which amends sections 2, 3 and 29 of the Cigarette Tax Act, violated section 12 of article IV of the constitution, in that the "yea" and "nay" vote on the Bonus Act was not a "yea" and "nay" vote on the acts which articles 2 and 3 amended. No claim is made that the title of the Bonus Act does not fully cover its provisions. A similar contention was made in *Mitchell* v. *Lowden,* 288 Ill. 327, where it was said in reference to section 12 of article IV of the constitution, "This section does not require a separate vote upon each section or provision of the bill. The bill may contain many provisions creating new rights and duties and so establishing new laws applicable to the conditions which are the subject of the enactment, but it is not necessary that each of these

provisions be voted upon separately." The same contention was made in *Hagler* v. *Small,* 307 Ill. 460, which involved the World War I Bonus Act. The principle announced in the *Lowden case* was applied.

Plaintiffs contend that, as taxpayers, they are entitled to relief against the payment of expenses incurred in the publication of the Bonus Act and the giving of notice of the election, on the ground that the obligations were incurred at a time when no appropriation had been made to meet them. Insofar as the question is open for consideration on plaintiffs' pleading, it is sufficient to say that their contention is fully answered in *Fergus* v. *Brady,* 277 Ill. 272. Section 19 of article IV of the constitution prohibits the General Assembly from authorizing the payment of any claim or part thereof created against the State under any agreement or contract made without express authority of law. It directs that an unauthorized agreement or contract shall be null and void except in the matter of appropriations for expenditures incurred in repelling invasions or suppressing an insurrection. In the *Fergus case,* reference was made to the provision which authorized claims made under authority of law, and it was said: "In section 19 claims under any agreement or contract made by express authority of law are excepted, and if there is some particular and specific thing which an officer, board or agency of the State is required to do; the performance of the duty is expressly authorized by law. That authority is express which confers power to do a particular, identical thing set forth and declared exactly, plainly and directly, with well-defined limits, and the only exception under which a contract exceeding the amount appropriated for the purpose may be valid is where it is so expressly authorized by law. An express authority is one given in direct terms, definitely and explicitly, and not left to inference or to implication, as distinguished from authority which is general, implied or not directly stated or

given." Under the authority of that case, the contention is without merit.

The final contention is that the act undertakes to confer legislative powers upon the Service Recognition Board. Such board consists of the Governor, State Treasurer and Adjutant General. By section 1-4 they are vested with complete charge and control of the general scheme of payments, authority to adopt general rules for the making of such payments, the ascertainment and selection of proper beneficiaries and the amount to which the beneficiaries are entitled. The board is also given the power to adopt general rules determining the question of whether an applicant was a resident of this State at the time he entered the service. The authority thus given extends to the right to prescribe rules for the nature of the proof to be submitted to establish the fact of residence.

The argument is directed to that part of the act which authorizes the board to determine who are residents of the State. It is said that the word "resident" is of such uncertain and indefinite meaning that the board may, in exercising the discretion which the act purports to give, adopt arbitrary rules which would increase or decrease the class intended to receive compensation under the act. If the act delegates to the Recognition Board the power to make the law which involves a discretion as to what the law shall be, it violates article 3 of the constitution. But if it only confers authority or discretion which is to be exercised under the limits of the act in the manner of its execution and application, it is valid. (*People ex rel. Rice* v. *Wilson Oil Co.* 364 Ill. 406; *Klafter* v. *State Board of Examiners of Architects,* 259 Ill. 15; *Spiegler* v. *City of Chicago,* 216 Ill. 114.) In *Arms* v. *Ayer,* 192 Ill. 601, quoting from Sutherland on Statutory Construction, it was said: "The true distinction is between a delegation of power to make the law, which involves a discretion as to what the law shall be, and conferring an

authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first can not be done; to the latter no objection can be made."

The act provides that the compensation is to be paid only to one who at the time of entering the service "was a resident of the State." In determining who is a resident of the State, the board performs no legislative function. Reference is made to certain statutes requiring residence for a certain period of time before an act can be done, as, for illustration, the election laws, and filing of a suit for divorce. Those cases are not applicable to the requirement of the statute in this case. Here the only requirement is that the applicant must have been a resident of the State when he entered the service. Residence ordinarily means that a person has his home in a particular place. This involves the question of intent with which he is staying in that place. If a person goes to a place with the intention of remaining for a limited time, although in point of fact he may remain for a year or more, still this does not constitute him a resident. It is his intent accompanied with his acts, and not the lapse of time, which determines whether he is a resident of the particular place. The word "resident" is in common usage and is generally understood to mean one having more than a mere physical presence. These are matters that the General Assembly could authorize the Service Recognition Board to determine. Their power to act in such matters is circumscribed to the finding that the applicant was a resident of the State when he entered the service. Taking into consideration the general purpose and scheme of the whole act, we are satisfied that no legislative functions were conferred on the Service Recognition Board.

The decree of the circuit court was correct on all the questions that are the subject of review on this appeal.

*Decree affirmed.*