(No. 35431.—

GILBERT H. SCRIBNER, JR., *et al.*, Appellants, *vs.* BENJAMIN J. SACHS *et al.*, Appellees.

*Opinion filed January 22, 1960.*

SCHAEFER, J., dissenting.

LOUIS A. KOHN, SAMUEL W. WITWER, E. DOUGLAS SCHWANTES, WILLIAM M. TRUMBULL, ALBERT E. JENNER, JR., A. W. BRUSSELL, JEROME S. WEISS, and JAMES T. OTIS, all of Chicago, GERALD C. SNYDER, of Waukegan, and EDWARD W. CLEARY, of Urbana, for appellants.

HARRY G. FINS, of Chicago, and EDWARD C. EBERSPACHER, of Shelbyville, for appellees.

Mr. CHIEF JUSTICE HOUSE delivered the opinion of the court:

This appeal is from an order of the circuit court of Lake County dismissing appellants' statement of contest to obtain a recount of all ballots cast at the general election of November 4, 1958, on the proposed amendment to article VI of the constitution of Illinois. The contestants appeal directly to this court pursuant to section 23—30 of the Election Code. Ill. Rev. Stat. 1959, chap. 46, par. 23—30.

On December 8, 1958, the State Electoral Board announced its determination that the judicial amendment to the Illinois constitution had not been adopted. Thereafter, on the same day the statement of contest was filed by ten residents of Lake and Cook counties pursuant to section 23—24 of the Election Code. (Ill. Rev. Stat. 1957, chap. 46, par. 23—24.) A temporary injunction order was entered enjoining all appropriate public officials from destroying or otherwise failing to preserve all ballots and other relevant documents they might have in their custody. The Attorney General filed his answer and five residents of Cook, Iroquois, Will, Winnebago and Macon counties were permitted to intervene and file answers. The intervenors were given leave to withdraw their answers and they joined in a single motion to dismiss the statement of contest. After extensive oral argument, the circuit court rendered a memorandum opinion and on May 21 the final order dismissing the statement of contest was entered.

No evidence was heard by the circuit court and all questions on this appeal are limited to the pleadings consisting of the statement of contest and intervenors' motion. The contestants alleged, in substance, that election officials throughout the State erroneously failed to count as valid votes ballots marked with a check ($\checkmark$) or the word "yes" and that if such ballots had been counted there would have been sufficient affirmative votes to secure the adoption of the proposed amendment. The intervenors advanced several grounds in support of their motion to dismiss, but those pertinent to this appeal are that the statement of con-

test was not filed within the time prescribed by statute and that the contestants' allegations with regard to ballots marked with a check or the word "yes" are contrary to law. The circuit court held that the statement of contest was filed within the time prescribed by statute but that only ballots marked with a cross (✗) are valid, and entered the dismissal order.

The first question is whether the contestants' statement was filed within the time prescribed by statute. Section 23—24 of the Election Code provides that the written statement of contest is to be filed in the circuit or superior court "within thirty (30) days after the result of the election shall have been determined." Here the result of the election was determined and announced in the morning of December 8, 1958, and this suit was filed in the afternoon of the same day.

The intervenors contend that since the result of the election was determined on December 8 and since the contestants' statement had to be filed within thirty days after the result of the election was determined, the earliest possible day on which the statement could legally be filed was December 9. This contention is based on the familiar rule that in counting time where an act is to be performed within a particular period the first day is to be excluded and the last day included. (Ill. Rev. Stat. 1957, chap. 131, par. 1.11.) They conclude that since the statement was not filed "within" the statutory thirty-day period the circuit court never acquired jurisdiction to enter the injunction order or hear the case. We cannot agree with this contention.

There is an evident legislative intent in the judicial contest provisions of the Election Code to provide an expeditious procedure for final determination of election results. Thus, in section 23—23 it is provided that the contest may be heard by "the judge in vacation," and that the contest "shall have preference in the order of hearing to

all other cases." We are of the opinion that "within thirty (30) days after the result of the election shall have been determined" means that the judicial contest of an election cannot be commenced before the administrative procedure for canvassing the votes has been completed and not later than thirty days after the canvass has been completed. (Cf. *Zimmerman* v. *Cowan*, 107 Ill. 631.) The contestants' statement was, therefore, filed within the time prescribed.

This brings us to the crux of the case, namely, whether a vote on a proposed constitutional amendment must be indicated by the use of a cross. There is no constitutional requirement that a cross be used to indicate a vote in any election. Section 2 of article XIV of the constitution of 1870, as changed by the "Gateway Amendment" in 1950, provides that an amendment to the constitution shall be submitted to the electors of the State for adoption or rejection, at the next election of members of the General Assembly, in such manner as may be prescribed by law, prescribes the proportion of electors requisite for adoption, and further provides for printing a proposed amendment on a separate ballot or in a separate column. The section is silent with respect to the use of a cross and was likewise silent prior to the amendment. Thus, the constitution leaves the manner of calling and holding an election upon a constitutional amendment within the discretion of the legislature, save only that it must be submitted at the next ensuing election of members of the General Assembly.

In order to reach the problems with which we are confronted, the entire legislative pattern concerning elections must be considered. We believe, however, that for a better understanding of contestants' position we should first turn to the historical background of sections 16—6, 16—7 and 17—11 of the Election Code, (Ill. Rev. Stat. 1957, chap. 46, pars. 16—6, 16—7, 17—11,) which the contestants rely on as being determinative of whether a vote on a proposed

constitutional amendment must be indicated by the use of a cross.

The Australian Ballot Law was enacted in 1891. Section 16 thereof provided that a constitutional amendment or other public measure appear on the ballot. Apparently the ballot contemplated was the general ballot. Section 16 was amended in 1899 to require the use of a separate ballot on a proposed amendment or a public measure. The section, however, both before and after the amendment, prescribed the use of a cross. Similarly, section 4 of the statute on amendments to the constitution, (Cahill's Stat. 1927, p. 97) which provided the form of ballot for a constitutional amendment prior to 1929, included instructions for the use of a cross. In 1929 section 16 of the Ballot Law (Cahill's Stat. 1929, p. 1187,) was amended by deleting any mention of constitutional amendments but leaving it applicable to public measures in substantially its original form, which included instructions for the use of a cross. At the same time section 15½ (p. 1187) was added covering the form of ballots for constitutional amendments, but directions for marking by cross were omitted. A companion measure in 1929 amended section 4 of the act relating to constitutional amendments (Cahill's Stat. 1929, p. 98,) by eliminating entirely the form of ballot and instructions for use of a cross and provided that the ballot should be printed in accordance with the provisions of the Ballot Law of 1891. Other amendments, not pertinent here, were later made and, under the present Election Code, section 16 is incorporated as section 16—7 and section 15½ is incorporated as section 16—6. Section 23 of the original Ballot Law of 1891 is the antecedent of present section 17—11 of the Election Code, and has always provided for voting by the use of a cross both for candidates and on questions submitted to a vote of the people.

Contestant's theory that the use of a cross in voting

on a constitutional amendment is unnecessary may be fairly summarized as follows: first, they assert that there is no express requirement that a vote be indicated by a cross and that the legislative pattern of a separate ballot, with separate treatment from other subjects of election and comparison of statutory terminology, furnishes no persuasive authority for exclusive use of the cross; second, they contend that the omission of the prior requirement in section 16 of the Ballot Law that a vote on a constitutional amendment be by a cross is indicative of a legislative intent to do away with that requirement; third, they ask that any provision for use of the cross be held directory where the voters' intention is reasonably ascertainable and not violative of the principle of secrecy of the ballot, and that we hold a check mark or the written word "yes" in the appropriate square not to constitute an identifying mark or gound for rejection of the ballot; and fourth, they contend that to require the use of a cross in voting on a constitutional amendment would be violative of the voter's constitutional rights.

It is fundamental that to determine the legislative intent embodied in a statute covering a general subject all of the provisions must be considered. (*City of East St. Louis* v. *Touchette,* 14 Ill.2d 243,) and if there is more than one statute on the general subject all the statutes must be considered. (*People ex rel. Schwartz* v. *Fagerholm,* 17 Ill.2d 131.) Attention must first be given to the statute on amendments to the constitution, (Ill. Rev. Stat. 1957, chap. 7½ pars. 1-8,) because it is special in scope and would be controlling on this issue. (*Routt* v. *Barrett,* 396 Ill. 322.) Since that statute is silent as to how a ballot may be marked in voting on proposed constitutional amendments, it is necessary to turn to the Election Code, (Ill. Rev. Stat. 1957, chap. 46, pars. 1—1 *et seq.,*) which provides for elections generally, to ascertain whether its provisions are pertinent. *People ex rel. Schwartz* v. *Fagerholm,* 17 Ill. 2d 131.

There was a studied intention on the part of the legis-

lature to group the 546 separate sections of the Election Code by their subject matter into some 30 articles, each article gathering into itself the law relating to that particular subject matter. In order to gain the legislative intent with regard to sections 16—6, 16—7 and 17—11, consideration must be given to articles 16 and 17 of the Election Code as a whole.

Prior to 1891 there was no such thing in Illinois as an "official" ballot. Until then the ballots in this State were provided by the individual candidates or the political parties; and, of course, such ballots were not uniform in size, form or color. The Australian Ballot Law of 1891 originated the plan of having a uniform "official" ballot at all elections, printed and distributed at public expense by the election authorities. Article 16 is a continuation of this plan. Its eleven sections deal with the preparation and distribution of an "official" ballot and card of instructions at public expense for elections coming within the Election Code.

Section 16—3 provides the form of ballot for offices such as President, Senator, Governor and State and county officers, section 16—4 provides the form of ballot for certain judicial elections, section 16—6 provides the form of ballot for proposed constitutional amendments or the calling of a constitutional convention, and section 16—7 provides the form of ballot for public measures. In none of these sections is there any direction by the legislature as to the manner in which the ballot provided for therein should be marked except in a part of section 16—7 dealing with public measures and there a cross is directed.

Article 17 contains twenty-seven sections which deal with the actual conduct of elections on the day of the election, as distinguished from the preparations prior to election day outlined in articles 11 through 16. Section 17—11 specifically provides that the voter shall prepare his ballot by making a cross to indicate the candidate of

his choice or the answer he desires to give on "a question submitted to the vote of the people."

The contestants contend that if section 17—11 were intended to apply to voting on proposed constitutional amendments, the omission expressly to say so would be inconsistent with the general pattern of separate treatment of proposed constitutional amendments throughout the Election Code. They point out that a separate blue ballot is provided for in section 16—6, that section 17—9 requires the blue ballot to be placed on top of the other ballots when delivered to the voter, that section 17—12 dealing with delivery of ballots to the judges of election makes separate reference to the blue ballot, that section 18—5 also provides for placing the blue ballot on top of other ballots when delivered to the voter, that separate treatment of the contest of elections on proposed constitutional amendments is provided for in section 23—24, that section 24—11 prohibits the use of voting machines on proposed constitutional amendments and that section 24—16, dealing with the precinct canvass of votes, makes express provision with respect to votes on proposed constitutional amendments.

We believe that the omission to expressly provide that a cross is not required in voting on a proposed amendment is consistent with the statutory pattern. Wherever the provisions of the special statute on amendments to the constitution do not cover the procedure for submitting a proposed constitutional amendment to the people, the Election Code is controlling. Thus, the provisions of the Election Code on such matters as the qualification of voters, the registration of electors, the establishment of precincts, the appointment of judges of the election, supplying ballot boxes, poll books and ballots, and the conduct of the election are all applicable to proposed constitutional amendments. Whenever the legislature wished to give special treatment to some phase of submitting a proposed amend-

ment it did so in a plain and explicit manner as evidenced by the sections previously mentioned. We feel that the legislature would have expressly provided a different manner of marking the separate blue ballot if it had intended to do so.

The contestants next contend that section 17—11 does not apply to proposed constitutional amendments because the word "question" as used therein has a technical meaning. They point out that the "measure," "question" or "proposition" in section 16—7 is in fact stated in the form of a question to be punctuated with an interrogation mark, whereas the form of the blue ballot prescribed in section 16—6 for proposed amendments does not state the proposal in the form of a question. We do not feel that the legislature intended to put such a restrictive meaning on the word "question." As we have indicated, the legislature has generally evidenced its intent to give special treatment to proposed amendments in plain and explicit terms.

It is then asserted that section 17—11 is applicable only to the general ballot and not to separate ballots. Contestants point out that section 16—7 and section 28—2 expressly require a cross where the question or measure appears on a separate ballot by reason of not being State-wide in character. They conclude that since the blue ballot is a separate ballot, section 17—11 does not apply to it. If this argument were accepted then the contestants would have to admit that between 1929 and 1950 a cross was required for proposed amendments because they were printed on the "general" ballot during that period. In addition, section 16—4 which provides for a separate judicial ballot does not expressly provide that it shall be marked with a cross. Again we feel that if the legislature had intended section 17—11 to apply only to the "general" ballot, it would have so provided.

In a further attempt to show that the legislature eliminated the requirement of a cross in voting on proposed

constitutional amendments, the contestants have devoted a portion of their brief to the historical background of the various sections of the Election Code dealing with proposed amendments. They refer to the struggle that took place for more than fifty years to liberalize the amending of the constitution which was virtually unamendable for so many years. (See Sears, Constitutional Revision in Illinois, 33 Ill. L. Rev. 2; Sears and Laughlin, A Study in Constitutional Rigidity, 10 U. of Chi. L. Rev. 142; 11 U. of Chi. L. Rev. 374.) They state that in 1899 the election laws were amended to require proposed amendments to be submitted upon a separate ballot, (Hurd's Stat. 1899, chap. 46, par. 303,) that in 1929 section 15½ (Cahill's Stat. 1929, p. 1187,) was enacted which provided that such proposals should be placed in the lefthand column of the main ballot, that in 1949 a separate ballot was again provided, which ballot was to be blue in color and contain an explanation of each proposed amendment and certain conspicuous legends, (Ill. Rev. Stat. 1949, chap. 46, par. 16—6,) and that in 1951 the legislature expressly excluded the use of voting machines in voting on proposed amendments. (Ill. Rev. Stat. 1951, chap. 46, par. 24—11.) They also refer to a "Party Circle" bill, providing for constitutional proposals to be voted upon under party circles in accordance with the endorsement of the respective political parties for or against the proposal, which bill was overwhelmingly passed by the General Assembly but vetoed by the Governor in 1945. The contestants conclude that these various legislative attempts to encourage increased voter participation and facilitate the amending process reveals a legislative intent to eliminate the requirement of a cross in voting on proposed amendments.

This history of attempts to secure a greater vote on proposed amendments was reflected in specific enactments for a separate ballot, or a preferred position on the ballot, or one of a distinct color, or provision for detailed in-

structions, or of the manner of delivering the ballot to the voter, or the prohibition of the use of voting machines. In each instance the legislation was plain and explicit. Nowhere in the history of this legislation is there an indication that the well-established method of marking all ballots with a cross should be eliminated. Although the object of much of this legislation was an attempt to promote the adoption of proposed amendments and although the elimination of the requirement of marking the ballot with a cross might have advanced this objective, we believe that the legislature would have done so expressly, as it did in the other enactments, if it had intended to do so.

While the arguments advanced by the contestants are plausible, we do not think that they are convincing. Considering sections 16—6 and 16—7 as a part of article 16, and 17—11 as a part of article 17 and articles 16 and 17 as a part of the entire Election Code, it is obvious to us that the method of marking all ballots is governed by section 17—11. Sections 16—6 and 16—7 merely deal with the form of ballots for proposed amendments and public measures.

The fact that a cross was required in section 16 of the Ballot Law and in section 4 of the statute on amendments to the constitution, and that this requirement was omitted in 1929 in newly enacted section 15½ and amended section 4, does not change our view. It is true that an amendment creates a presumption that it was intended to change the law as it formerly existed, (*McLaughlin* v. *People,* 403 Ill. 493; *Acme Fireworks Corp.* v. *Bibb,* 6 Ill. 2d 112,) but this presumption is not necessarily controlling and may be overcome by more persuasive considerations. (50 Am. Jur., Statutes, sec. 275.) We believe that there are a number of matters which, when considered as a whole and along with the statutory pattern just analyzed, overcome this presumption.

First, we agree with the trial court that it does not

seem logical that the legislature would intentionally delete a definite standard for ascertaining the voter's intention in a vote on a most serious issue without setting a different standard. Considering the large number of voters whose intention may manifest itself in numberless variants and the thousands of voting officials who must distinguish between valid and invalid votes, there must be some standards as to the marking of a ballot.

Second, to hold that section 16—6 controls the issue of how the ballot provided for therein should be marked would be inconsistent with the interpretation to be given other sections of article 16. The only place where a cross is mentioned in that article is in a part of section 16—7. The contestants' explanation for mentioning the cross there is that that part of section 16—7 deals with a separate ballot and the marking of the general ballot is controlled by section 17—11. This explanation is contrary, however, to their theory that old section 15½ eliminated the use of a cross on proposed amendments because section 15½ provided that the proposed amendment should be on the general ballot. In addition, section 16—4, which provides for a separate judicial ballot, does not expressly provide that it shall be marked with a cross.

Third, no writer on the subject of voting on proposed constitutional amendments has ever suggested that any change in the method of marking the ballot was made in 1929 or any time thereafter. (See Witwer, A Constitutional Convention for Illinois, 37 Ill. B.J. 9; Powell, A Plan for Facilitating Constitutional Amendment in Illinois, 30 Ill. L. Rev. 59; Sears, Voting on Constitutional Conventions and Amendments, 2 U. of Chi. L. Rev. 612; Sears and Laughlin, A Study in Constitutional Rigidity, 10 U. of Chi. L. Rev. 142.) Although Sears, Powell, Witwer and other keen students of the subject have all discussed the 1929 amendments, none of them has suggested that the legislature eliminated the requirement that a cross

be used to vote on proposed amendments. In fact, Professor Powell in his article in 30 Illinois Law Review indicates at page 61 the need for a cross and discusses the 1929 amendments without noting any change.

Fourth, election officials have instructed voters that they should use a cross in marking their ballot either for or against a proposed constitutional amendment. Although an erroneous construction of an unambiguous statute by administrative officials is not binding upon the courts, (*Winakor* v. *Annunzio*, 409 Ill. 236; *County of Lake* v. *Westerfield*, 273 Ill. 124,) this fact reveals that the election officials were unaware of any distinction that should be made in the marking of the separate blue ballot.

Fifth, the 1957 report of the Election Laws Commission to the Governor and General Assembly reveals that the commission considered using a check mark as well as a cross as a valid voting symbol. It declined to recommend such legislation however.

As we have indicated, we fail to gather a legislative intent that ballots on proposed constitutional amendments should be voted and cast with less formality than those for other public measures or for candidates for public office. A review of the cases construing the election laws shows that the courts have always manifested a desire to carry into effect the intention of the voter, if the intention can be determined with reasonable certainy. This was true before the Ballot Law was adopted in 1891, as shown by *McKinnon* v. *People ex rel. Malzacher*, 110 Ill. 305 and *Behrensmeyer* v. *Kreitz*, 135 Ill. 591, and since, as indicated in such cases as *Tuthill* v. *Rendelman*, 387 Ill. 321 and *Gulino* v. *Cerny*, 13 Ill.2d 244. Some provisions of the Election Code have been construed as directory rather than mandatory and thereby protected voters from being deprived of their right to vote through inadvertence or mistake. As to the marking of a ballot, we have consistently followed the holding in *Parker* v. *Orr*, 158 Ill. 609, decided

in 1895, that the "X" used in directing the manner of voting is merely directory as to the exact form of cross to be used, but that an honest attempt to make a mark which resembles a cross must appear on the ballot. No case is cited, nor do we find one, which holds to the contrary.

In an unbroken line of cases various symbols and markings other than by cross have been held insufficient. The letters "V," "e" and "Y" in *Boland* v. *City of LaSalle,* 370 Ill. 387, various lines that did not cross in *Greene* v. *Bjorseth,* 350 Ill. 469, a straight line or a circle in *Isenburg* v. *Martin,* 293 Ill. 408; the letters "O," "P," "U" and "V" and an oblique line in *Allen* v. *Fuller,* 332 Ill. 304, were all held to be improper markings of ballots. A check mark was held insufficient in the *Boland case,* the *Isenburg case* and *Grubb* v. *Turner,* 259 Ill. 436. The word "Yes" was held not to constitute a valid vote in the *Isenburg case* and in *Mayes* v. *City or Albion,* 374 Ill. 605. The cases cited in which the ballot was counted where the word "Yes" was written on the ballot are *Parker* v. *Orr,* 158 Ill. 609, *Mayes* v. *City of Albion,* 374 Ill. 605, and *Tuthill* v. *Rendelman,* 387 Ill. 321. In *Parker,* the word was written on a proposition on the general ballot while the case involved only a contest for public office, in *Rendelman* the word "Yes" had been written and an attempt made to obliterate it, and in *Mayes* the voter had written the word "Yes" in addition to placing the cross opposite the proposition. In each of these cases the question was whether the marks were distinguishing marks, not whether the use of the word constituted a valid vote.

The court has, nevertheless, been liberal in its interpretation of what constitutes a cross. Ballots have been held valid even though the markings constituting the cross were irregular, imperfect, faint or consisted of three lines. ( See *Neff* v. *George,* 364 Ill. 306; *Slenker* v. *Engel,* 250 Ill. 499; *Barlick* v. *Kunz,* 375 Ill. 318; *Atwater* v. *Eckard,* 282 Ill. 122; *Brents* v. *Smith,* 250 Ill. 521; *Greene* v. *Bjorseth,* 350

Ill. 469.) Similarly, a broad view has been taken as to whether marks on ballots other than the cross constitute distinguishing marks which violate the secrecy of the ballot. (See e.g. *Griffin* v. *Rausa*, 2 Ill. 2d 421; *Gulino* v. *Cerny*, 13 Ill. 2d 244; *Neal* v. *Odle*, 308 Ill. 469; *Winn* v. *Blackman*, 229 Ill. 198; *Barlick* v. *Kunz*, 375 Ill. 318.) We agree with the contestants that under our holdings the use of a check or the written word "yes" or "no" does not constitute a distinguishing mark *per se*.

We are now asked, however, to declare ballots valid where the cross was not used but an attempt was made to vote by use of a check or "yes." In order to so hold, precedent extending back over 60 years would have to be overturned. Despite our rulings, of which the legislature is entirely familiar, it has never seen fit to relax the election laws on the question of use of the cross. This in itself seems a manifestation of intent. It further seems self-evident that to deviate from the use of a cross at this late date would be usurping the prerogative of the legislative branch, specifically given to it by the constitution.

It is argued ably and strenuously that the intention of the voter is clear and that he should not be disfranchised through inadvertence, mistake or ignorance. The right to vote is not an inalienable right. It is conditioned upon proper registration, appearing at the polls during the times fixed by the statute, voting in the proper precinct and the like. A voter may lose his vote by moving across the street or the county line. (*Tuthill* v. *Rendelman*, 387 Ill. 321; *Clark* v. *Quick*, 377 Ill. 424.) The legislature in its wisdom has provided laws governing the method of voting. When the voter ignores the clear rules of a precautionary character laid down as a prerequisite to his right to have his vote counted, he should not be heard to complain.

We are not so naïve as to believe that a person who uses a check or writes the word "yes" or "no" is not expressing his intention. Undoubtedly, his intention is mani-

fested. On the other hand the same could be true of a star, an asterisk, a circle or other symbol placed opposite the way he wishes to register his vote. If we take the view that the legislative method of use of the cross be ignored in favor of the two methods espoused by the contestants, we will be called upon again and again to pass upon the use of other symbols or words in voting. Instead of a plain statute which says, in effect, voter, you must mark your vote with a cross in order to have it counted, the voter's right would depend upon the view of election judges in his precinct, or the courts if the election were contested. And yet the constitution says the legislature shall provide by law the manner of voting, not election officials and the court. The opportunities for fraud would be vast and disfranchisement of many voters could follow. Uniformity in voting procedure would be a thing of the past. It is within the bounds of reason to speculate that the General Assembly took all of these things into consideration in refusing to change the method by which a ballot can be legally marked. If the legislature sees fit to provide an alternative method of marking a ballot, there would at least be guidance for the voter and election officials; whereas, if we deviate, great uncertainty will prevail. We feel that there is no compelling authority which authorizes us to change our interpretation of a law which is so well known, recognized and followed, even though the issue before us is of State-wide interest.

The contestants' final contention is that a statute requiring the use of a cross in voting on proposed constitutional amendments is unconstitutional. They argue that under section 2 of article XIV of the Illinois constitution the voter is given the right to vote for the adoption or rejection of a proposed amendment, and his intention to "vote for" the proposed amendment must be given effect regardless of the form used to express such "vote for"; and that section 2 does not give to the legislature any

grant of power to either directly or indirectly change the "vote for" as given by the people at the polls.

Section 2 of article XIV of the constitution gives the elector the right to vote on proposed amendments and it also gives the legislature the power to provide the manner of submitting the proposed amendment to the electors of this State. The section provides that it shall be submitted at the next election of members of the General Assembly, provides the proportion of electors requisite for adoption, and for printing the proposed amendment on a separate ballot or in a separate column, otherwise the section is silent as to the manner of submission. The "manner" of submitting the proposed amendment to the electors indicates that the legislature has the power to provide by law the usual, ordinary or necessary details required for the holding of the election. *People ex rel. Jurgensen* v. *Czarnecki,* 265 Ill. 489.

As we have pointed out, millions of electors cast their votes on proposed amendments and the possible symbols or words that could be used to express their intent is numberless. There are thousands of election officials who must interpret such symbols and words, and what may be clear to one official may be ambiguous to another. Therefore, it is necessary as well as usual and ordinary for the legislature to provide some standard for marking the ballot in order to prevent fraud and to insure uniformity as to which ballots are to be counted. We cannot, therefore, accept contestants' argument that the legislature has no power under section 2 to provide for the method of marking a ballot when a proposed amendment is submitted to the electors.

It is also argued that to require a cross in voting on a proposed constitutional amendment violates section 18 of article II of the Illinois constitution which provides for free and equal elections, that it creates an unreasonable interference with a citizen's privileges and immunities, vio-

lates his rights to due process of law, and to equal protection under the fourteenth amendment to the Federal constitution and also under the due-process clause of the Illinois constitution. This argument is based on the premise that the legislature, by giving effect to a ballot marked only with a cross, is discriminating against and giving less influence to the ballot marked with a check or "yes."

As we have indicated the legislature has the power to provide a standard for marking a ballot. The standard set by the legislature is to mark the ballot with a cross. This requirement is applicable to all voters. There is no question of equal protection, due process, greater influence, *et cetera,* until a voter has failed to follow the standard set by the legislature. At this point it is not the statute that produces the result of which the contestants' complain but the act of the voter in not following the definite and unambiguous standard set by the legislature.

The contestants finally assert that the standard is discriminatory, unreasonable and arbitrary. We do not believe that the requirement that a ballot be marked with a cross is discriminatory, unreasonable or arbitrary either on its face or in its application. On the contrary, it is possible that if the legislature had provided as a standard that any symbol or words could be used as long as they reveal the voter's intention and do not destroy the secrecy of the ballot, that such a standard might be questioned in the courts as being discriminatory in its application. Thus, a symbol might be determined by the election judges of one precinct to indicate the voter's intent and not destroy the secrecy of the ballot while that same symbol might be determined by the election judges of another precinct to not indicate the voter's intent or to destroy the secrecy of the ballot. This situation would undoubtedly occur on numerous occasions in an election where there are millions of votes cast and thousands of officials applying such an indefinite standard to the numberless symbols and words that

would appear. All of the constitutional arguments advanced by the contestants would be available to the voter whose ballot was not counted because of the symbol he used, whereas other ballots with that same symbol were counted in other precincts.

We are of the opinion that the legislature has the power under the constitution of Illinois to provide by law the manner of marking a ballot for a proposed amendment and that the requirement that a cross be used does not violate any provision of the Illinois or Federal Constitutions. We are sympathetic with those electors who inadvertently marked their ballot with a check or "yes," but we would be usurping the power of the legislature to hold such ballots valid. In addition, such a holding would set the stage for frauds, bring about unintentional discriminatory acts by election officials and encourage election contests in every close election. Any new standard for the marking of a ballot should and must come from the legislature.

The order of the circuit court of Lake County is affirmed.

*Order affirmed.*

Mr. JUSTICE SCHAEFER, dissenting:

"The whole purpose of the ballot as an institution is to obtain a correct expression of intention, and if in a given case the intention is clear, it is an entire misconception of the purpose of the requirements to treat them as essentials,—that is, as objects in themselves, and not merely as means." Wigmore, Australian Ballot System, 2d ed., p. 195.

The opinion of the court concedes (1) that the check marks and the "yes" votes in this case clearly show the intention of the voters, and (2) that they are not identifying marks. Nevertheless the court holds that they are not to be counted. That result appears to be based upon a fear that if these clear indications of intention are counted, "thousands of election officials" will be confronted with

the task of interpreting "numberless possible symbols" that might be used by "millions of voters."

There have been problems of interpretation in the past. Ballots marked with an "irregularly-shaped mark, similar in form to the letter T," have been counted, (*Slenker* v. *Engel,* 250 Ill. 499; *Brents* v. *Smith,* 250 Ill. 521; *Arnold* v. *Keil,* 252 Ill. 340, 344,) as has a ballot marked with a character "something like the letter A." (*Hennessy* v. *Porch,* 247 Ill. 388, 391.) In *Hogdson* v. *Knoblauch,* 268 Ill. 315, a ballot was counted on which in "several instances the voter brought the lines together practically at right angles, but one line did not cross the other." A St. Andrew's cross has been counted, (*Isenberg* v. *Martin,* 293 Ill. 408, 413); so have ballots marked ⊗ and ⊕ (*Winn* v. *Blackman,* 229 Ill. 198, 210.) Problems of interpretation like these, and the many others that have arisen, will arise in the future. They can not be wished away by failing to count the simple and straightforward expressions of intention that are now before us.

I would reverse and remand so that the ballots in question can be counted and the will of the people ascertained.