EL PUEBLO DE PUERTO RICO, demandante y recurrente, v. RAFAEL VILLALBA SUÁREZ, acusado y recurrido.

*Número:* 486        *Resuelto:* 30 de octubre de 1962

*J. B. Fernández Badillo, Procurador General,* y *Genoveva R. de Carrera, Procurador General Auxiliar,* abogados de El Pueblo; *Godofredo M. Gaetán,* abogado del recurrido.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

El Juez Asociado Señor Dávila emitió la opinión del Tribunal.

Determinar si la denuncia radicada contra el recurrido en el Tribunal de Distrito, Sala de San Juan, aduce hechos constitutivos de delito, es la única cuestión que el presente recurso plantea. Al acusado se le imputó "que el día 20 de febrero de 1959, como a las 4:12 P.M., y en la 'Barandilla' de San Juan, P. R., el referido acusado Rafael Villalba Suárez, allí y entonces, ilegal, voluntaria, maliciosa, criminalmente, y a sabiendas violó lo dispuesto en el Artículo 9-c de la Ley Núm. 194 de 1951 (Ley Hípica de Puerto Rico), consistente en que en la fecha, hora y sitio arriba indicados me ofreció y aceptó una apuesta clandestina en relación al probable orden de llegada de la Tercera Carrera que se celebró el referido día 20 de febrero de 1959 en el Hipódromo 'El Comandante' de Puerto Rico y cuya apuesta no se registró en forma legal alguna en el referido Hipódromo ese día, jugada hecha para 'Banca de Segunda Clandestina'. En la tercera carrera le jugué al caballo Núm. 8 que lo era 'Galicia' y que corría junto a los caballos Yuca; Corre Corre; El Pillo; Corregidor II; Miriam; Pródigo; Fiesta; Corsario y Papo. La puesta consistía en que el caballo al cual le jugué 'Galicia' llegaría segundo en la referida carrera. Le pagué al aquí acusado Rafael Villalba Suárez la cantidad de $1.00 por dicha apuesta clandestina y en el momento de efectuarse la misma ya habían empezado las carreras en el referido Hipódromo y las bancas

que tiene el referido Hipódromo fuera de la estructura del mismo no podían aceptar apuestas para ser registradas en forma alguna en el referido Hipódromo." ∎

El artículo 9c. adicionado a la "Ley Hípica de Puerto Rico" de 1950 (Ley Núm. 421 de 14 de mayo de 1950)—15 L.P.R.A. sec. 181 *et seq.*—por la Ley Núm. 194 de 1951— 15 L.P.R.A. sec. 191—que se alega infringido, disponía([1]) lo siguiente en su parte pertinente:

"Cualquier persona . . . que ofrezca o acepte una apuesta con relación al probable orden de llegada de cualquier ejemplar de carrera en violación a esta Ley, será culpable de delito menos grave (misdemeanor) y convicta que fuere, será castigada con multa. . ."

El tribunal de distrito que conoció en primera instancia del asunto determinó que los hechos imputados no constituían delito público. Revisada esa determinación mediante certiorari por el Tribunal Superior, se confirmó. Expedimos auto de revisión para determinar la corrección de lo actuado.

La contención del acusado es que la Ley Hípica de 1950 según enmendada en el 1951, no disponía absolutamente nada en relación a como se llevarían a cabo las apuestas en relación con las carreras de caballo. Y no disponiéndose nada sobre el particular, no pueden constituir delito los hechos imputados en la denuncia radicada, ya que como hemos visto lo que la ley establecía que constituiría delito era ofrecer o aceptar una apuesta "en violación a esta Ley". En su argumentación el recurrido además sostiene que si bien es verdad que la citada ley autorizaba a la Comisión Hípica, organismo creado por dicha ley, para que reglamentara todo lo concerniente al deporte hípico, y que en efecto ésta promulgó reglas para llevar a cabo las apuestas, este Reglamento no constituye la ley a que se refiere el artículo 9-c que se alega infringido.

---

([1]) Esta ley fue derogada por la Núm. 149 de 22 de julio de 1960— 15 L.P.R.A. sec. 181 *et seq.* (ed. 1961)—.

La cuestión planteada impone un análisis de la ley. La Ley Hípica de 1950 según enmendada por la de 1951, creó un organismo administrativo, la Comisión Hípica, y autorizó a este organismo a "reglamentar todo lo concerniente al deporte hípico en Puerto Rico". Art. 4—15 L.P.R.A. sec. 184—. Detalló los poderes concedidos, pero dejó establecido que esa enumeración no limitaba sus poderes. Entre los enumerados estaba el de "[r]eglamentar todo aquello que se relacione con la forma en que deberán hacerse las apuestas en las bancas alemanas, 'pools', 'mutuals subscription funds', doble selección, quinielas, o cualquier otro sistema de apuestas". Disponía asimismo que "[l]a Comisión previa audiencia pública, preparará los reglamentos del deporte hípico y una vez que dichos reglamentos sean aprobados por el Gobernador y publicados por la Comisión, los mismos tendrán fuerza de ley y su violación constituirá delito menos grave castigable según se dispone en esta Ley". La Comisión promulgó reglamentos y dispuso entre otros múltiples detalles, la forma en que se aceptarían apuestas. ([2])

La Ley, pues, dispuso que ofrecer o aceptar apuestas en violación de la ley constituirá un delito, al igual que dispuso que otros actos relacionados con el deporte hípico también constituirán delito y estableció las penalidades que su violación conllevaría, pero autorizó a un organismo administra-

---

([2]) A ese efecto se dispuso:

"A los efectos del presente reglamento se entenderá por bancas alemanas el sitio o caseta designado para la venta de boletos para efectuar apuestas en dinero a los caballos que tomen parte en cada carrera.

Estas bancas alemanas sólo podrán funcionar dentro de los hipódromos autorizados por la Comisión Hípica de Puerto Rico y en los días de celebración de carreras.

Los billetes de apuestas, libros o libretas de apuestas que se lleven en cada hipódromo para el funcionamiento de bancas alemanas, deberán tener la previa aprobación de la Comisión Hípica de Puerto Rico, podrán ser inspeccionados en cualquier momento por dicha Comisión Hípica de Puerto Rico o sus inspectores debidamente nombrados, no pudiendo ser alterados, modificados o cambiados sin la previa aprobación de la Comisión Hípica de Puerto Rico.

tivo a establecer reglas sobre todo lo concerniente al deporte, entre ellas, cómo se harían las apuestas, y dispuso que esas reglas tendrían fuerza de ley y su violación constituiría delito menos grave castigable según disponía la propia ley. Así, la Asamblea Legislativa ejercitó su facultad de imponer la penalidad que conllevaba la violación de los reglamentos cuya promulgación se delegó en la Comisión Hípica. O sea, al que violara las disposiciones reglamentarias que aprobara la Comisión Hípica la propia ley disponía que se castigaría como establecía el artículo 9c. citado. De igual manera sucedía con las otras disposiciones de la ley.

El acusado invoca el caso de *United States* v. *Eaton*, 144 U.S. 677 (1892), pero los hechos que tuvo ante sí el tribunal federal eran distintos. En el caso de *Singer* v. *United States*, 323 U.S. 338 (1945) se explicó el caso de *Eaton* así:

"En el caso de *Eaton* el estatuto imponía una contribución sobre la oleomargarina y regulaba detalladamente la producción de ésta. La sección 5 disponía que debían llevarse aquellos libros y récords que el Secretario del Tesoro así indicare. Pero no se imponía penalidad alguna por el no cumplimiento de dicha disposición. Sin embargo, en otras secciones se establecían requisitos para los productores y se imponían penalidades para el caso de infracciones a dichas secciones. La sección 20 otorgaba al Secretario el poder para promulgar todas las reglas necesarias para hacer cumplir la ley. Bajo dicha sección fue promulgado un reglamento requiriendo a los mayoristas llevar

La Comisión Hípica de Puerto Rico podrá suspender por justa causa, en cualquier tiempo, las jugadas de bancas alemanas; entendiéndose, que tales suspensiones no serán en ningún tiempo por un período mayor de 60 días en un año natural.

La corporación, sociedad o dueño del hipódromo, nombrará un administrador para cada banca, cuya persona será la encargada de responder al inspector oficial de las infracciones e irregularidades que se cometan.

En cada banca habrá un timbre eléctrico conectado con la caseta del jurado para que éste anuncie la hora en que deben ser cerradas las jugadas en cada carrera. El toque del timbre que dé el jurado cuando salen los caballos del 'paddock', será el primer aviso a las bancas y una vez los caballos estén cerca del punto de partida, se dará el segundo aviso por mediación del timbre del jurado para el cierre de las mismas." 15 R. & R.P.R. sec. 184–313.

un determinado récord. La acusación fue por el no cumplimiento de esta disposición. La sección 18 imponía penalidades por falta de cumplimiento de todo aquello 'requerido por la ley'. La corte sostuvo que la violación a la regla promulgada al amparo de la sección 20 no constituía un delito. Su razonamiento fue que habiendo el Congreso establecido penalidades para ciertos actos, y no por la falta de llevar libros, tal omisión no podía ser suplida por un reglamento. Además, el Congreso no había dispuesto sanciones para la violación de los reglamentos promulgados bajo la sección 20."

En la ley interpretada en el caso de *Eton* se exigía a los traficantes en oleomargarina que ejecutaran ciertos actos y dispuso la penalidad que el no hacerlo conllevaba. Disponía además que debían llevar libros para recoger cierta información pero no imponía penalidad por no hacerlo. Luego en el Reglamento se adicionaron otros detalles que debían incluirse en la información a recopilarse en los libros y se estableció la penalidad por su violación, pero el Congreso no había dado autorización para que en el Reglamento se impusieran penalidades. Aquí la situación es otra. Expresamente se autorizó por la Asamblea Legislativa a la Comisión Hípica para que reglamentara todo lo concerniente al deporte hípico, incluyendo específicamente la forma en que debían hacerse las apuestas. Entonces expresamente dispuso que esa reglamentación tendría fuerza de ley y que cualquier violación se castigaría como en la propia ley se disponía. No puede leerse la sección 9c. aislada completamente de las otras disposiciones de la ley. Hay que considerar la sección 9-c conjuntamente con las disposiciones arriba transcritas referentes al poder de la Comisión Hípica para reglamentar la celebración de carreras de caballos. Es pertinente citar la interpretación que la Corte Suprema de los Estados Unidos le dio al caso de *Eaton* en el de *Singer:*

"La decisión en *United States* v. *Eaton* gira sobre sus hechos específicos particulares como enfatizó la corte en *United States* v. *Grimaud,* 220 U.S. 506, 518–519. No ha sido interpretado

como que establece que un reglamento jamás puede ser una 'ley' para los fines de procesar criminalmente. Puede ser o no así, dependiendo de la redacción de cada estatuto en particular."

Y esa precisamente es la situación en este caso. El Reglamento complementa la ley.

Se apunta que en la Nueva Ley Hípica de 1960—15 L.P.R.A. sec. 181 *et seq.* (ed. 1961—se dispuso en el artículo 16, equivalente al que se alega infringido en este caso, que "[c]ualquier persona . . . que ofrezca o acepte una apuesta con relación al probable orden de llegada de cualquier ejemplar de carrera en violación de esta ley y/o *de los reglamentos de la Junta* . . ." (énfasis suplido), demostrando la Asamblea Legislativa al adicionarle el concepto de "violación de los reglamentos" que la Ley de 1951 no cubría este aspecto. Como regla general la enmienda o reenactación de un estatuto adicionándole o supliéndole conceptos, constituye evidencia demostrativa de la intención de alterar su significado. *El Estado ex rel Lektrich* v. *Ydrach*, 77 D.P.R. 41 (1954). Ahora, hay ocasiones en que surgen dudas sobre el significado del lenguaje usado o sobre la validez de una disposición estatutaria y entonces la Asamblea Legislativa la enmienda. En esas ocasiones la enmienda no altera sino que explica o aclara. *Cranford* v. *City of Lake Charles*, 92 So.2d 141 (La. 1957); *Youngstown Steel Prod. Co.* v. *State Board of Equal*, 306 P.2d 983 (Calif. 1957); *Scribner* v. *Sachs*, 164 N.E.2d 481 (Ill. 1960); *In re Petition of Detroit Edison Company*, 87 N.W. 2d 126 (Mich. 1957); *County Bd. of Equalization* v. *Musogee Ind. Fin. Corp.*, 357 P.2d 224 (Okl. 1960); *City of Redfield* v. *Wharton*, 115 N.W.2d 329 (S.D. 1962); *Lewis* v. *Annie Creek Mining Co.*, 48 N.W.2d 815 (S.D. 1951); y véase además *Pueblo* v. *Tribunal Superior*, 81 D.P.R. 763, 785 (1960).

La denuncia en este caso fue radicada en el Tribunal de Distrito a mediados del año 1959. En marzo de 1960 radicó el acusado alegato en apoyo de su contención de que la denuncia no aducía hechos constitutivos de delito, y el juez

de dicho tribunal así lo determinó por resolución dictada el 1ro. de junio de 1960. La Nueva Ley Hípica fue aprobada por la Asamblea Legislativa a fines de junio de 1960, Diario de Sesiones de la Asamblea Legislativa, 1960, pág. 2268, y aprobada por el Gobernador el 22 de julio siguiente. Parece pertinente citar aquí de *Cranford* v. *City of Lake Charles*, supra, al efecto de que " . . . si se enmienda una ley poco después de haber surgido divergencias sobre su alcance es probablemente razonable y lógico así creer, que la intención fue aclarar su significado". ■

El recurrido sostiene además que aun suponiendo que en el art. 9c. se estableciere un delito público, el mismo sólo se aplica a apuestas clandestinas efectuadas dentro de los hipódromos. Para sostener su posición nos cita el informe de la Comisión que en la Cámara de Representantes consideró el proyecto que se convirtió en la ley enmendatoria de 1951. En dicho informe la Comisión hace suyo uno que le sometiera el Director Hípico y que explicaba así el propósito del art. 9c.:

"La enmienda que se recomienda se introduzca al Artículo 9(c) que se adiciona en virtud de este proyecto es para cubrir aquellas situaciones de apuestas entre personas con relación al probable resultado de una carrera o al probable orden de llegada de cualquier ejemplar en cualquier carrera. Es más o menos lo que se ha hecho en otros deportes en Puerto Rico, especialmente, en el juego de pelota (Baseball) donde está terminantemente prohibido y castigado por ley esta modalidad de apuesta entre los concurrentes al espectáculo. La experiencia nos ha demostrado que estas personas que así apuestan han sido los promotores en pasados años de los motivos y escándalos en los hipódromos de Puerto Rico. Por tal razón es necesaria la erradicación completa de tal práctica corrupta e ilícita." Actas, Cámara de Representantes 1951, págs. 1151, 1158.

Como se verá, el informe expresa que "es necesaria la erradicación completa de tal práctica corrupta e ilícita". Ciertamente no hubiera sido completa la erradicación si se hubiera

permitido "la práctica corrupta e ilícita" de apuestas clandestinas fuera de los límites territoriales del hipódromo. Si la intención de la Cámara hubiera sido que el delito proscrito por la sección 9c sólo se cometía cuando se aceptaban u ofrecían apuestas dentro de los hipódromos, fácil hubiera sido expresarlo claramente en la ley. Que esto es así lo demuestra el hecho de que la Nueva Ley Hípica en su artículo 16—15 L.P.R.A. sec. 197 (ed. 1961)—expresamente se hizo constar que "[l]as disposiciones de esta Sección se aplican a cualquiera de las violaciones de esta ley que en ella se especifican cuando éstas se cometan en cualquier sitio, dentro o fuera de los límites territoriales de un hipódromo". Para que no hubiera la más mínima duda en cuanto a cuál era la intención, la Asamblea Legislativa expresamente lo hizo así constar. Sería absurdo sostener que bajo la ley anterior la Asamblea Legislativa sancionó el que fuera de los hipódromos se podían aceptar y ofrecer apuestas sin reglamentación de clase alguna por la Comisión Hípica, si la intención era erradicar completamente esa práctica corrupta e ilícita. Pero es que hay algo más, el Reglamento promulgado por la Comisión Hípica, vigente a la fecha en que se alega se cometieron los hechos que dieron margen a la denuncia y que como hemos visto tiene fuerza de ley, expresamente dispuso que las bancas "sólo podrán funcionar dentro de los hipódromos autorizados por la Comisión Hípica de Puerto Rico y en ios días de celebración de carreras".

*Por las razones expuestas, se revoca la sentencia que dictó el Tribunal Superior, Sala de San Juan, con fecha 3 de febrero de 1961, y se devuelve el caso para ulteriores procedimientos compatibles con lo aquí expuesto.*