(No. 53774.-

COALITION FOR POLITICAL HONESTY *et al.,* Petitioners, v. THE STATE BOARD OF ELECTIONS *et al.,* Respondents.

*Announced September 2, 1980.—Opinion filed December 1, 1980.—Rehearing denied January 29, 1981.*

GOLDENHERSH, C.J., and RYAN, J., dissenting.

William T. Barker, Jeffrey E. Schiller, Matthew A. Flamm, and Thomas W. Dressler, of Sonnenschein, Carlin, Nath & Rosenthal, and Robert W. Bergstrom, of Bergstrom, Davis & Teeple, all of Chicago, for petitioners.

Tyrone C. Fahner, Attorney General, of Springfield (Saul J. Morse and William P. Ryan, Special Assistants Attorney General, of counsel), for respondent State Board of Elections *et al.*

Andrew M. Raucci, of Chicago, for respondents David Mendel Patt and Jeff E. Bruner.

PER CURIAM: On August 11, 1980, leave was granted petitioners, the Coalition for Political Honesty, the Committee for Legislative Reform, Patrick J. Quinn, George C. Townsend, Jane M. Brayton and Stanley C. Johnson, individually and on behalf of all others similarly situated, to file this original action seeking a writ of *mandamus* directing the State Board of Elections (Board) to certify a proposed constitutional amendment for submission at the November 4, 1980, general election. The Board and its members, and David Mendel Patt and Jeff E. Bruner, who filed an objectors' petition with the State Board of Elections, were named as respondents. Because of a September 4 deadline (Ill. Rev. Stat. 1979, ch. 1, par. 104, and ch.

46, par. 10—14) for certifying proposed constitutional amendments to the county clerks and boards of election commissioners, we expedited briefing, heard oral argument on August 25, and announced on September 2 that the writ should issue, indicating that an opinion explaining the reasons therefor would be filed at a later date. This is that opinion.

Our constitution (Ill. Const. 1970, art. IV, sec. 1) provides: "The legislative power is vested in a General Assembly consisting of a Senate and House of Representatives elected by the electors from 59 legislative districts." Section 2 of article IV provides that one senator and three representatives shall be elected from each of those districts, and that in elections for representatives "each elector may cast three votes for one candidate or distribute them equally among no more than three candidates." Section 3 of article XIV, relating to constitutional revision, provides:

"Section 3. CONSTITUTIONAL INITIATIVE FOR LEGISLATIVE ARTICLE
Amendments to Article IV of this Constitution may be proposed by a petition signed by a number of electors equal in number to at least eight percent of the total votes cast for candidates for Governor in the preceding gubernatorial election. Amendments shall be limited to structural and procedural subjects contained in Article IV. A petition shall contain the text of the proposed amendment and the date of the general election at which the proposed amendment is to be submitted, shall have been signed by the petitioning electors not more than twenty-four months preceding that general election and shall be filed with the Secretary of State at least six months before that general election. The procedure for determining the validity and sufficiency of a petition shall be provided by law. If the petition is valid and sufficient, the proposed amendment shall be submitted to the electors at that general election and shall become effective if approved by either three-fifths of those voting on the amendment or a majority of those voting in the election.

Pursuant to the provisions of section 3 of article XIV,

petitioners in 1979 commenced circulating a petition proposing the following constitutional amendment:

## PETITION FOR AMENDMENT TO THE CONSTITUTION OF THE STATE OF ILLINOIS

We, the undersigned, being qualified electors of the State of Illinois who have affixed our signatures in our own proper person to this Petition subsequent to January 1, 1979, do hereby petition, pursuant to Section 3 of article XIV of the Constitution of the State of Illinois, that there be submitted to the qualified electors of this State, for adoption or rejection at the General Election to be held on Tuesday, the Fourth Day of November, A.D. 1980, in the manner provided by law, a proposition to amend Sections 1, 2, 3 of Article IV of the Constitution of the State of Illinois, the amended Sections and the Transition Schedule applicable thereto to read as follows:

Section 1. Legislature — Power and Structure

The legislative power is vested in a General Assembly consisting of a Senate and a House of Representatives, elected by the electors from 59 Legislative Districts and 118 Representative Districts.

Section 2. Legislative Composition

(a) One Senator shall be elected from each Legislative District. Immediately following each decennial redistricting, the General Assembly by law shall divide the Legislative Districts as equally as possible into three groups Senators from one group shall be elected for terms of four years, four years and two years, Senators from the second group, for terms of four years, two years and four years; and Senators from the third group, for terms of two years, four years and four years. The Legislative Districts in each group shall be distributed substantially equally over the State.

(b) Each Legislative District shall be divided into two Representative Districts. In 1982 and every two years thereafter one Representative shall be elected from each Representative District for a term of two years.

(c) To be eligible to serve as a member of the General Assembly, a person must be a United States citizen, at least 21 years old, and for the two years preceding his election or appointment a resident of the district which he is to represent. In the general election following a redistricting, a candidate for the General Assembly may be elected from any district which contains a part of the district in which he resided at the time of the redistricting and reelected if a resident of the new district he represents for 18 months prior to reelection.

(d) Within thirty days after a vacancy occurs, it shall be filled by appointment as provided by law. If the vacancy is in a Senatorial office with more than twenty-eight months remaining in the term, the appointed Senator shall serve until the next general election, at which time a Senator shall be elected to serve for the remainder of the term If the vacancy is in a Representative office or in any other Senatorial office, the appointment shall be for the remainder of the term. An appointee to fill a vacancy shall be a member of the same political party as the person he succeeds.

(e) No member of the General Assembly shall receive compensation as a public officer or employee from any other governmental entity for time during which he is in attendance as a member of the General Assembly

No member of the General Assembly during the term for which he was elected or appointed shall be appointed to a public office which shall have been created or the compensation for which shall have been increased by the General Assembly during that term.

Section 3. Legislative Redistricting

(a) Legislative Districts shall be compact, contiguous and substantially equal in population. Representative Districts shall be compact, contiguous, and substantially equal in population.

(b) In the year following each Federal decennial census year, the General Assembly by law shall redistrict the Legislative Districts and the Representative Districts.

If no redistricting plan becomes effective by June 30 of that year, a Legislative Redistricting Commission shall be constituted not later than July 10. The Commission shall consist of eight members, no more than four of whom shall be members of the same political party.

The Speaker and Minority Leader of the House of Representatives shall each appoint to the Commission one Representative and one person who is not a member of the General Assembly. The President and Minority Leader of the Senate shall each appoint to the Commission one Senator and one person who is not a member of the General Assembly.

The members shall be certified to the Secretary of State by the appointing authorities A vacancy on the Commission shall be filled within five days by the authority that made the original appointment. A Chairman and Vice Chairman shall be chosen by a majority of all members of the Commission.

Not later than August 10, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.

If the Commission fails to file an approved redistricting plan, the Supreme Court shall submit the names of two persons, not of the same political party, to the Secretary of State not later than September 1.

Not later than September 5, the Secretary of State publicly shall draw by random selection the name of one of the two persons to serve as the ninth member of the Commission.

Not later than October 5, the Commission shall file with the Secretary of State a redistricting plan approved by at least five members.

An approved redistricting plan filed with the Secretary of State shall be presumed valid, shall have the force and effect of law and shall be published promptly by the Secretary of State.

The Supreme Court shall have the original and exclusive jurisdiction over actions concerning redistricting the House and Senate, which shall be initiated in the name of the People of the State by the Attorney General.

## TRANSITION SCHEDULE

This Amendment shall take effect the day following its passage and shall govern the Primaries and the General Election to be held in 1982 and thereafter.

We further petition that, to the extent permitted by law, said proposition shall be submitted on a separate Blue Ballot and that the proposition and the explanation thereof shall be printed thereon in substantially the following terms:

## PROPOSED AMENDMENT TO SECTIONS 1, 2, and 3 OF ARTICLE IV
(Legislative Article)
Explanation of Amendment

The purpose of the Amendment is to reduce the size of the House of Representatives from 177 to 118 members and to provide for the election of one Representative from each of 118 districts.

Place an X in the blank square opposite "Yes" or "No" to indicate your choice.

| | | |
|---|---|---|
| | YES | For the proposed Amendment to Sections 1, 2, and 3 of Article IV |
| | NO | of the Constitution (Legislative Article). |

240

| NAME | STREET and NUMBER | CITY, TOWN or VILLAGE | COUNTY | |
|------|-------------------|----------------------|--------|---|
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |
| | | | | County, Illinois |

STATE OF ILLINOIS
COUNTY OF _____ } ss.

I,_____, a qualified elector of the State of Illinois, do hereby certify that I am upwards of the age of 18 years, that I reside at No._____street in the_____of_____,County of_____
(write the word. city, town or village) (write the name of your city, town or village)
and State of Illinois, and that the signatures on this sheet were signed in my presence subsequent to January 1, 1979 and are genuine, and that to the best of my knowledge and belief the persons so signing were, at the time of signing said Petition, qualified electors of the State of Illinois, and that their respective residences are correctly stated, as above set forth.

Subscribed and Sworn to before me this
_____day of_____A.D., 19_____ _____
 (Your Signature)
_____
 Notary Public

My commission expires_____
[Seal] Sheet Number_____

At the time petitioners began collecting signatures, section 28—1.1 of the Election Code read:

"Sec. 28—1.1. Petitions filed under Section 28—1 shall consist of sheets of uniform size and each sheet shall contain, above the space for signature, an appropriate heading, giving the information as to the question of public policy to be submitted, the political division in which it is to be submitted, and the election at which it is to be submitted and the heading of each sheet shall be the same. Such petition shall be signed by the registered voters of the political division in which the question of public policy is to be submitted in their own proper persons only, and opposite the signature of each signer his residence address shall be written or printed (and if a resident of a city having a population of over 10,000 by the then last preceding federal census, the street and number of such residence shall be given); provided that the county or city, village or town, and state of residence of such electors may be printed on the petition forms where all of the such electors signing the petition reside in the same county or city, village or town, and state. Standard abbreviations may be used in writing the residence address, including street number, if any. No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with. At the bottom of each sheet of such petition shall be added a statement, signed by a registered voter of the political division in which the question of public policy is to be submitted, stating his residence address (and if a resident of a city having a population of over 10,000 by the then last preceding federal census, also stating the street and number of such residence), certifying that the signatures on that sheet of the petition were signed in his presence and are genuine, and that to the best of his knowledge and belief the persons so signing were at the time of signing the petition registered voters of the political division in which the question of public policy is to be submitted and that their respective residences are correctly stated therein. Such statement shall be sworn to before some officer authorized to administer oaths in this State. Such sheets, before being presented to the electoral board or filed with the proper officer of the electoral district or division of the state or municipality, as

the case may be, shall be neatly fastened together in book form, by placing the sheets in a pile and fastening them together at one edge in a secure and suitable manner, and the sheets shall then be numbered consecutively. The sheets shall not be fastened by pasting them together end to end, so as to form a continuous strip or roll. A petition, when presented or filed, shall not be withdrawn, altered, or added to, and no signature shall be revoked except by revocation in writing presented or filed with the officers or officer with whom the petition is required to be presented or filed, and before the presentment or filing of such petition. Whoever forges any name of a signer upon any petition shall be deemed guilty of a forgery, and on conviction thereof, shall be punished accordingly." (Ill. Rev. Stat. 1979, ch. 46, par. 28—1.1, as added by Pub. Act 79—408.)

On June 30, 1979, the General Assembly passed, and on August 11, 1979, the Governor signed, an act, effective immediately, amending section 28—1.1. As amended by Public Act 81—163, section 28—1.1 reads:

"Sec. 28—1.1 Petitions filed under Section 28—1 shall consist of sheets of uniform size and each sheet shall contain, above the space for signature, an appropriate heading, giving the information as to the question of public policy to be submitted, the political division in which it is to be submitted, and the election at which it is to be submitted and the heading of each sheet shall be the same. Such petition shall be signed by the registered voters of the political division in which the question of public policy is to be submitted in their own proper persons only, and opposite the signature of each signer his residence address shall be written or printed (and if a resident of a city having a population of over 10,000 by the then last preceding federal census, the street and number of such residence shall be given); provided that the county and city, village or town, and state of residence of such electors may be printed on the petition forms where all of the such electors signing the petition reside in the same county and city, village or town, and state. Standard abbreviations may be used in writing the residence address, including street number, if any. A petition proposing an amendment to Article IV of the Constitution pursuant to Section 3 of Article XIV of the Constitution may in-

clude only individual sheets which are in conformity with the following requirements; any sheets not in conformity shall not be received by the Secretary of State or considered as part of the petition:

(a) each sheet may be signed and circulated only by qualified electors who are residents of a single election jurisdiction; and

(b) the signature of the circulator of each sheet must be attested by a notary public or other officer authorized to administer oaths who is a legal resident of the same county as the circulator and petitioners who have signed that sheet;

(c) election jurisdiction means (a) an entire county, in the case of a county in which no municipal board of election commissioners is located or which is under the jurisdiction of a county board of election commissioners, (2) the territorial jurisdiction of a municipal board of election commissioners; and (3) the territory in a county outside of the jurisdiction of a municipal board of election commissioners having election jurisdiction within such county; in each instance election jurisdiction shall be determined according to which election authority maintains the permanent registration records of qualified electors. No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with. *** [The balance of the section remained unchanged.]'" (Ill. Rev. Stat. 1979, ch. 46, par. 28—1.1, as amended by Pub. Act 81—163.)

Petitioners thereafter continued to gather signatures, some but not all of the circulators attempting to comply with the new requirements.

Section 10—10 of the Election Code prescribes a random-sampling method of establishing the validity of signatures appearing on petitions. (Ill. Rev. Stat. 1979, ch. 46, par. 10—10.) This random-sampling approach, together with certain corrections agreed to by the parties, produced a stipulation between the parties in the hearing before the Board that there would be 254,941 valid signatures on the petition if signatures of those residing in the same election jurisdiction as the circulator were counted notwith-

standing the fact that those signatures appeared on sheets also containing signatures of nonresidents; it was also agreed that 252,008 signatures were required for a valid petition.

The Board, in a July 31 decision, sustained the objections in a 5-3 vote, the majority holding that the number of signatures appearing on sheets signed and circulated solely by qualified electors of a single election jurisdiction is insufficient; that all signatures appearing on other sheets may not be counted; and that the proposed amendment contained at least two separate and unrelated questions in violation of article III, section 3, of the Illinois Constitution.

Petitioners maintain that the application to their petition of the statutory provision excluding entire sheets of signatures from consideration because of the presence thereon of one or more nonconforming signatures violates article XIV, section 3, of the 1970 Illinois Constitution, as well as the equal protection clauses of the fourteenth amendment to the United States Constitution and article I, section 2, of the Illinois Constitution. Since we agree, we need not consider petitioners' contention that due process considerations preclude applying the amendment to petitioners' ongoing signature-collection process which had been in operation for some months.

A limited provision for popularly initiated amendment of the legislative article was included in the 1970 Illinois Constitution although the convention which drafted that provision rejected a more general proposal. (2 Record of Proceedings, Sixth Illinois Constitutional Convention 587 (hereinafter cited as Proceedings).) The majority of delegates appear to have believed that legislative reform presented unique problems and required a special provision. Delegate Perona, spokesman for the majority position of the Committee on the Legislature with respect to article XIV, section 3, stated:

"This provision has been structured to apply only to the legislative article and to be limited to the area of government which it is most likely will not be changed in the constitution by amendment. The legislature, being composed of human beings, will be reluctant to change the provisions of the constitution that govern its structure and makeup, the number of its members, and those sort of provisions.

\*\*\*

In other areas of the constitution I think it has been demonstrated that the General Assembly has and will submit changes without the concern of their vested interest in the situation." 4 Proceedings 2911.

The explanation of this limited initiative contained in the Report of the Committee on the Legislature stated:

"The primary reason for offering a limited constitutional initiative proposal for the Legislative Article is quite simple: members of the General Assembly have a greater vested interest in the legislative branch of government than any other branch or phase of governmental activity.

Cognizant of this fundamental fact of life, the Legislative Committee proposes that the people of the State of Illinois reserve the right to propose amendments by the initiative process to the Legislative Article. \*\*\*

In addition to this primary reason for proposing a limited form of Constitutional initiative, the Legislative Committee believes:

--(1) the greatest virtue in having this provision rests in the potential for keeping the General Assembly more responsive on matters directly and vitally affecting them;

--(2) voters can better decide on the merits of proposals suggesting changes in the Legislative Article since they are not directly and personally involved; and

--(3) this is a method to circumvent a legislature which might be dominated by interests opposing legislative changes." 6 Proceedings 1399-1400.

We noted in an earlier case construing article XIV, section 3 (*Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, quoting *People ex rel. Keenan v. McGuane* (1958), 13 Ill. 2d 520, 527, *cert. denied* (1958), 358 U.S. 828, 3 L. Ed. 2d 67, 79 S. Ct.

46), that, " '[w]hile in construing the constitution the true inquiry concerns the understanding of the meaning of its provisions by the voters who adopted it, still the practice of consulting the debates of the members of the convention which framed the constitution has long been indulged in by courts in determining the meaning of provisions which are thought to be doubtful.' " (65 Ill. 2d 453, 467.) Further evidence of purpose appears in the explanation of article XIV, section 3, contained in the "Address to the People" adopted by the convention:

> "Amendments to the Article on the Legislature, of a structural, or procedural nature, may be proposed by petition, with signatures at least equal in number to eight percent of the total vote for Governor in the preceding election. Thus a reluctance on the part of the General Assembly to propose changes in its own domain can be overcome." 7 Proceedings 2677-78.

Respondents rely on two provisions of the Illinois Constitution to support the amendatory language of section 28—1.1 which requires invalidation of whole sheets of signatures. The first is the statement in article XIV, section 3, that "[t]he procedure for determining the validity and sufficiency of a petition shall be provided by law" (Ill. Const. 1970, art. XIV, sec. 3), and the second is the statement in article III, section 4, that "[t]he General Assembly by law shall *** insure secrecy of voting and the integrity of the election process ***" Ill. Const. 1970, art. III, sec. 4).

We note with respect to article III, section 4, however, that the Report of the Committee on Suffrage and Constitution Amending stated:

> "The Committee's proposal directs the legislature to devise and enact safeguards for all phases of the election process. *The Committee's mandate also, by implication, prohibits the enactment of procedures which add nothing to the integrity of suffrage except to disenfranchise otherwise qualified voters or otherwise encumber the election process.*" (Emphasis added.) 7 Proceedings 2348.

The concept of popular initiative limited to amendment of the legislative article is apparently unique to Illinois. (4 Proceedings 2710.) It was drafted and adopted as a check on the legislature's self-interest, and the necessity to protect the rights conferred thereby from debilitating legislation is implicit in the convention's action. We believe it is clear from the convention proceedings that the quoted constitutional provisions are to be construed so as to effectuate the basic purpose of article XIV, section 3, to provide a workable initiative scheme unfettered by restraints which unnecessarily inhibit the rights which article XIV confers.

This court has had other occasions to consider legislative requirements which burdened fundamental voting rights. Our decision in *Anderson v. Schneider* (1977), 67 Ill. 2d 165, is illustrative. There this court construed section 10—2 of the Election Code so as to avoid holding that section unconstitutional and refused to allow the names of seven candidates to be stricken from a ballot because of the failure of an eighth to fulfill statutory requirements. The court stated:

> "May the electoral board strike from the ballot the name of the Independent Township Caucus Party, as well as that of seven of its candidates, because the eighth candidate has not fulfilled the statutory residence requirement? The sanction imposed by the electoral board and the circuit court was a harsh one. It affects not only the rights of the candidates but those of the voters. Nor have the defendants suggested any reason why such a sanction is necessary to protect the integrity of the electoral process." (67 Ill. 2d 165, 171.)

Although that decision was based on due process and equal protection considerations, those same considerations are relevant here.

> "It is obvious that voting is a fundamental right in our system of government. 'No right is

more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.' *Wesberry v. Sanders* (1964), 376 U.S. 1, 17, 11 L. Ed. 2d 481, 492, 84 S. Ct. 526, 535." (67 Ill. 2d 165, 172.)

To paraphrase what was there said (67 Ill. 2d 165, 174), the rights of those who seek to place their own names on the ballot and those who seek to place a proposition on the ballot " 'do not lend themselves to neat separation' "; each statute affecting a proposition to amend our constitution has some effect on the voter (*Bullock v. Carter* (1972), 405 U.S. 134, 144, 31 L. Ed. 2d 92, 99, 92 S. Ct. 849, 856). Clearly, the rights of those who seek to exercise their constitutional privilege to initiate an amendment to that constitution are intertwined with the rights of those who vote thereon. (*Lubin v. Panish* (1974), 415 U.S. 709, 39 L. Ed. 2d 702, 94 S. Ct. 1315.) And the "strict scrutiny" to which the Supreme Court has subjected legislative restrictions upon the right to vote (*Bullock*) is, in our judgment, apposite here. While the General Assembly is authorized to establish the "procedure for determining the validity and sufficiency of a petition" (Ill. Const. 1970, art. XIV, sec. 3), that procedure cannot unnecessarily restrict the initiative privilege.

The initiative procedure of article XIV, section 3, is relatively new to this State, and there are no Illinois cases directly on point. Courts of other jurisdictions, however, have carefully protected constitutionally provided initiative plans from unnecessarily burdensome legislative restrictions. Thus, the Supreme Court of Nebraska appropriately observed, with reference to its constitutional initiative and referendum procedure, that " '[a]ny legislation which would hamper or render inef-

fective the power reserved to the people would be unconstitutional.' " (*Klosterman v. Marsh* (1966), 180 Neb. 506, 513, 143 N.W.2d 744, 749.) That court there held that a referendum petition was valid despite claims that the signatures thereon had been collected over an excessive period and that a requirement that the title or text of the act referred to be on the sheets of the petition had not been satisfied. See also *State ex rel. Ayres v. Amsberry* (1920), 104 Neb. 273, 177 N.W. 179, *vacated on other grounds* (1920), 104 Neb. 279, 178 N.W. 822.

The Supreme Court of Oklahoma, in *In re Initiative Petition No. 23* (1912), 35 Okla. 49, 127 P. 862, considered a popular initiative procedure and liberally construed formal petitioning requirements so as not to allow technical defects, such as failure to specify county of residence or to properly complete circulators' certificates, to invalidate a petition. The court said:

> "The right of direct legislation in the people must be administered by the officers charged with that duty in such manner as to make it operative. If technical restrictive constructions are placed upon the laws governing the initiation and submission of these measures, the purpose and policy of the people in establishing the same will be entirely defeated \*\*\*. Necessarily even with the best safeguards that can be thrown around the circulation of petitions, where such a large number of names are required, inaccuracies and technical departure from prescribed forms are certain to occur every time a petition is circulated. \*\*\* [T]hese things are proper to be noted and taken in consideration in the administration of this law. It can be made effective or defeated by the officers charged with its administration, and it is our duty to sustain it, rather than destroy, if it can be

accomplished within the law." 35 Okla. 49, 58-59, 127 P. 862, 866.

Recently the Supreme Court of Arizona considered that State's initiative power in *Stillman v. Marston* (1971), 107 Ariz. 208, 484 P.2d 628. It construed as ineffective for purposes of initiative petitions a statute which had ostensibly cancelled all voter registrations, thus depriving a petition circulator of his pool of potential signers. The court wrote:

> "Petitioner contends that cancellation by the county recorder of all voter registrations in his county on the day immediately following the general election in 1970, operates to unconstitutionally deprive him of his constitutionally guaranteed right of initiative by eliminating the entire class of persons eligible to sign his petition—qualified electors—until they have requalified by reregistering. Were this the effect of subsection D we would agree. We believe, however, that the effect of subsection D can be construed in harmony with petitioner's right to obtain the necessary signatures on his petition." 107 Ariz. 208, 209, 484 P.2d 628, 629.

Unfortunately, the statutory provision here cannot be so construed. Section 28—1.1 cannot be read so as to eliminate the penalty disqualification of entire sheets. It states clearly:

> "A. petition proposing an amendment to Article IV of the Constitution pursuant to Section 3 of Article XIV of the Constitution may include only individual sheets which are in conformity with the following requrements; any *sheets* not in conformity shall not be received by the Secretary of State or considered as part of the petition:
>
> (a) each sheet may be signed and circulated only by qualified electors who are residents of a single election jurisdiction; and
>
> (b) the signature of the circulator of each sheet must

be attested by a notary public or other officer authorized to administer oaths who is a legal resident of the same county as the circulator and petitioners who have signed that sheet;

(c) election jurisdiction means (a) an entire county, in the case of a county in which no municipal board of election commissioners is located or which is under the jurisdiction of a county board of election commissioners, (2) the territorial jurisdiction of a municipal board of election commissioners; and (3) the territory in a county outside of the jurisdiction of a municipal board of election commissioners having election jurisdiction within such county; in each instance election jurisdiction shall be determined according to which election authority maintains the permanent registration records of qualified electors. No signature shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 46, par. 28—1.1.)

The first paragraph of amended section 28—1.1 is in stark contrast to the penalty provided by the section as it read before amendment:

"No *signature* shall be valid or be counted in considering the validity or sufficiency of such petition unless the requirements of this Section are complied with." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 46, par. 28—1.1.)

Special counsel for the Board at one point apparently suggested that article XIV, section 3, petitions might continue to be tested on a signature-by-signature basis under the statute as amended (Transcript of Proceedings, State Board of Elections, May 5, 1980, at C2233-34), but that result seems incompatible with a fair reading of the statutory phraseology.

It is arguable, of course, that the great number of signatures on an article IV, section 3, petition justifies some simplification of the verification process and that penalties may be imposed for actions which complicate that process. In fact, respondents urge that the statutory restrictions are necessitated by the recent experience with a statewide

referendum on what was popularly known as the Thompson proposition in connection with which a number of individuals were convicted of misconduct in circulating petitions. We agree that our constitution requires the General Assembly to adopt necessary measures ensuring the integrity of the initiative process, and that this involves a legitimate State interest. The crux of the matter, however, is whether disqualification of an entire sheet of signatures is necessary. In this context it is appropriate to paraphrase the language of the Supreme Court in *Illinois State Board of Elections v. Socialist Workers Party* (1978), 440 U.S. 173, 185, 59 L. Ed. 2d 230, 242, 99 S. Ct. 983, 991:

> " '[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,' [constitutionally granted rights to initiate constitutional amendments] *Kusper v. Pontikes* [(1973), 414 U.S. 51, 58-59; 38 L. Ed. 2d 260, 267; 94 S. Ct. 303, 308], and we have required that States adopt the least drastic means to achieve their ends. [Citations.] "

The difficulty with respondents' argument is that the penalty provided—the disqualification of entire sheets—is simply too harsh. It is not the "least drastic means" of insuring the integrity of the initiative process.

Respondents have not demonstrated that the State's interest in integrity could not be served by the less drastic penalty of disqualification of signatures of those from jurisdictions other than that of the circulator. This less drastic penalty would not clog the random-sampling process or appreciably slow the Board's verification proceedings since a single election official of the circulator's jurisdiction could check all signatures on any individual sheet, by merely ignoring signatures from other jurisdictions. (*Richards v. LaVelle* (7th Cir. 1980), 620 F.2d

144.) Respondents Patt and Bruner, perhaps sensing the indefensible character of such a requirement, argue that petitioners could have validated the sheets by crossing out all nonconforming signatures prior to filing.

Even were that procedure to be permitted, the result would still be extremely harsh. If petitioners missed an improper signature, if petitioners made an error in determining which addresses were within the jurisdiction, or if one who listed his address ambiguously by merely listing the name of a town lying on a county line or other boundary was subsequently determined to have signed the wrong sheet, the penalty would apply. The penalty would also apparently apply even if a signature had been maliciously affixed by one seeking to sabotage the petition drive.

In our judgment a penalty provision which disqualifies an entire sheet of 24 proper and valid signatures because the 25th is improper is a constitutionally impermissible limitation upon the article XIV right of initiative. Our holding does not, of course, invalidate the entire section or any provision other than that disqualifying an entire sheet because of one or more improper signatures.

Respondents also argue that the petitioners' proposition is contrary to article III, section 3, of the 1970 Illinois Constitution, which reads, "All elections shall be free and equal." Respondents assert that section is violated by the proposition before us, which they argue presents three separate questions: (1) whether the size of the House of Representatives should be reduced, (2) whether cumulative voting should be abolished, and (3) whether representatives should be elected from single-member districts. Some of our early cases considered identical language in article II, section 18, of the 1870 Illinois Constitution and can be read as indicating that separate questions cannot be combined into a single proposition, and that the voter has a right to vote upon each question separately. (See

*O'Connor v. High School Board of Education* (1919), 288 Ill. 240, and *People ex rel. Toman v. Chicago Great Western R.R. Co.* (1942), 379 Ill. 594.) Our more recent opinions, however, clearly establish that it is only separate and *unrelated* questions which cannot be combined in a single proposition. *Village of Deerfield v. Rapka* (1973), 54 Ill. 2d 217, 223-24; *Schoon v. Board of Education* (1957), 11 Ill. 2d 91; *Roll v. Carrollton Community Unit School District No. 1* (1954), 3 Ill. 2d 148, 151-52; *Routt v. Barrett* (1947), 396 Ill. 322.

*Village of Deerfield* involved a proposition combining the question whether land should be acquired for a recreational center and the question whether bonds should be issued to pay for the purchase. This court there said:

> "It should be observed that this court has considered that the constitutional proscription under discussion was against the combining of separate and unrelated questions into a single proposition for submission to a vote. Conversely it has been held that where a submitted proposition did not contain separate and unrelated questions, the proposition was not violative of the constitution. (*Routt v. Barrett*, 396 Ill. 322.) The simple circumstance that a proposition contained more than one question has not made it constitutionally defective. (*Roll v. Carrollton Community Unit School Dist.*, 3 Ill. 2d 148.)" (54 Ill. 2d 217, 224.)

The court held that combining the two questions relating to the same subject was not a violation of the "free and equal" elections clause. *Schoon* held constitutionally permissible the proposition to issue bonds for the combined purposes of purchasing a site and building a high school, building and equipping an addition to the grade school, and altering and repairing other buildings. Likewise, *Roll* approved a proposal to issue school bonds for multiple but related purposes, refusing to follow the

earlier *O'Connor* case and treating it as statutorily rather than constitutionally based; *Toman* was similarly distinguished. *Routt* held the question whether money should be appropriated to pay a World War II bonus and the question whether a tax should be levied to provide funds were not improperly joined.

Similarly, we do not believe that the related questions now before us are constitutionally prohibited. If the three questions were presented at a single election as separate propositions incongruous results might follow, *e.g.*, the voters might vote to retain cumulative voting and adopt single-member districts. The alternative, presenting the questions at separate elections, would require at least four years of uncertainty and confusion caused by a legislature in an intermediate stage of development, and might, depending on the order in which the questions were presented, produce incongruous results.

Combination of questions (2) and (3) (abolishing cumulative voting and adopting single member districts) appears to be clearly permissible, for the former is subsumed by the latter. Too, the official Blue Ballot, adopted by the convention, by which the 1970 constitution was submitted to the voters, contained the following proposal:

1.

WHICH OF THE FOLLOWING PROVISIONS SHALL THE LEGISLATIVE ARTICLE OF THE PROPOSED 1970 CONSTITUTION CONTAIN CONCERNING THE ELECTION OF REPRESENTATIVES TO THE GENERAL ASSEMBLY? (Vote ONLY for one)

| 1A. | Election of the 177 members of the House of Representatives from *multi-member districts by cumulative voting.* | 1A | |
|-----|------------------------------------------------------------------------------------------------------------------|----|--|
| | | OR | |
| 1B. | Election of the 177 members of the House of Representatives from *single member districts.* | 1B | |

7 Proceedings 2767.

Certainly proposition 1A posed questions upon which a voter might wish to give different answers. The fact that

the convention delegates thought it permissible to com-
bine the multimember districts and cumulative voting
questions seems to us quite persuasive that separate ques-
tions may be combined in a single proposition as long as
they are reasonably related to a common objective in a
workable manner. No claim was ever made that that ballot
violated the "free and equal" elections clause of the 1870
Constitution.

The situation with respect to questions (1) and (3)
is similar, if less clear. The question of number of members
is tied to the question of number of districts in that co-
ordination of the two would sometimes be necessary to
avoid inconsistency, *e.g.,* approval of a proposition to
reduce the House to a number not divisible by 59, coupled
with failure of a proposition changing the number of
districts.

Respondents argue in effect that proponents may pro-
pose a multipart proposition only if a voter may not
reasonably be expected to oppose one part and favor
another. They rely heavily upon Arizona cases construing
its constitution, a reliance we believe misplaced. Article
21, section 1, of the Arizona constitution provided: "If
more than one proposed amendment shall be submitted at
any election such proposed amendments shall be submit-
ted in such manner that the electors may vote for or
against such proposed amendments separately." The
Supreme Court of Arizona held in *State ex rel. Jones v.
Lockhart* (1953), 76 Ariz. 390, 265 P.2d 447, that a con-
stitutional amendment did not violate article 21 although
it provided for "both (a) an increase in the size of the
Senate, and (b) a limitation on the future membership of
the House to freeze it at its present size, accomplished by a
changed basis of apportionment." (76 Ariz. 390, 395, 265
P.2d 447, 451.) The court concluded:

"The question of change in the *number* of senators

has nothing to do with the problem, the question is whether a provision as to senators and their apportionment to the counties may logically and lawfully be coupled with a provision as to representatives and their apportionment. Clearly both relate to, and are germane to, one general subject, *i.e.,* the composition of the state legislature, and historically the people of this state have considered that but one subject was involved, to-wit: 'The Legislature', albeit that legislature is bicameral." (76 Ariz. 390, 397, 265 P.2d 447, 452.)

The court reached its conclusion despite the fact that Arizona voters had indicated the possibility of opposing positions on the two questions by twice before changing the size and apportionment of the House through the initiative process, while leaving Senate membership unchanged. The Arizona Supreme Court approved the combination of the separate questions because they "relate to, and are germane to, one general subject, *i.e.,* the composition of the state legislature." It seems apparent, however, in view of the earlier action by the Arizona electorate, that many voters would have favored one of the questions while opposing the other. *Lockhart,* in our judgment, does not support respondents; rather, since the questions in our proposition clearly "relate to, and are germane to, one general subject," *Lockhart* would approve the proposal before us. There are two other interesting Arizona cases, *Hood v. State* (1975), 24 Ariz. App. 457, 539 P.2d 931, and *Kerby v. Luhrs* (1934), 44 Ariz. 208, 36 P.2d 549, both relied on by respondents as limiting the proposition to one upon the separate but related parts of which no voter could reasonably be expected to take opposite positions. It seems clear, however, from the *Lockhart* opinion, which controls both *Hood* and *Kerby,* that the key to the test is the relationship between the

questions. If there is a reasonable, workable relationship to the same subject, the proposal may be submitted for approval or rejection by the voters.

The test which respondents attempt to derive from *Kerby* would, in our judgment, be unworkable. Almost any proposition can be broken into simpler questions. Even those propositions which appear simplest involve some implied assumptions on which the voters are not allowed to fully express themselves. The "Thompson Proposition," which the respondent board cites as an example of properly related questions, would clearly fail the respondent objectors' *Kerby* test. That proposition, submitted at the November 1978 election, stated:

> "Shall legislation be enacted and the Illinois Constitution be amended to impose ceilings on taxes and spending by the State of Illinois, units of local government and school districts?"

A reasonable man might well favor a ceiling on taxes without a ceiling on spending, or might favor applying a ceiling to the State but not to units of local government and school districts or vice versa.

Decisions of the highest courts of other States construing functionally analogous provisions of their constitutions are similar in tenor to our more recent cases. The Supreme Court of California considered an analogous provision of the California Constitution in rejecting an attack on the famous "Proposition 13" initiative. (*Amador Valley Joint Union High School District v. State Board of Equalization* (1978), 22 Cal. 3d 208, 583 P.2d 1281, 149 Cal. Rptr. 239.) Article II, section 8, of the California Constitution provides in part:

> " 'An initiative measure embracing more than one subject may not be submitted to the electors or have any effect.' "
> (22 Cal. 3d 208, 229, 583 P.2d 1281, 1289, 149 Cal. Rptr. 239, 247.)

The California Supreme Court stated:

"As previously noted, article XIII A consists of four major elements, a real property *tax rate* limitation (sec. 1), a real property *assessment* limitation (sec. 2), a restriction on *state* taxes (sec. 3), and a restriction on *local* taxes (sec. 4). Although petitioners insist that these four features constitute separate *subjects*, we find that each of them is reasonably interrelated and interdependent, forming an interlocking 'package' deemed necessary by the initiative's framers to assure effective real property tax relief." 22 Cal. 3d 208, 231, 583 P.2d 1281, 1290, 149 Cal. Rptr. 239, 248.

The Supreme Court of Georgia in *Carter v. Burson* (1973), 230 Ga. 511, 198 S.E.2d 151, and the Supreme Court of Louisiana in *State ex rel. Kemp v. City of Baton Rouge* (1949), 215 La. 315, 40 So. 2d 477, have considered constitutional provisions almost identical to the Arizona provision earlier quoted. Those cases involved claims, based on reasoning similar to that which respondents attribute to *Kerby,* that the propositions submitted actually combined several separate amendments. The Georgia Supreme Court said:

"The test of whether an Act or a constitutional amendment violates the multiple subject matter rule is whether all of the parts of the Act or of the constitutional amendment are germane to the accomplishment of a single objective. Welborne v. State, 114 Ga. 793, 820, 40 S.E. 857. If so, it does not violate the rule; otherwise, it does." (230 Ga. 511, 519, 198 S.E.2d 151, 156.)

The Louisiana Supreme Court wrote:

"It does, therefore, seem that the proposed amendment must be logically viewed as a Plan of Government which, while embracing several subjects, all are germane to the general purpose of the

amendment, and that the constitutional requirements have been met in their submission by one amendment." 215 La. 315, 327, 40 So. 2d 477, 481.

Regardless of whether one focuses upon the interrelationship of all of the facets of the proposition, or their relationship to a common subject or objective, the proposition before us passes muster. The questions which respondents find in petitioner's proposition are not "separate and unrelated" as prohibited by *Village of Deerfield*, for they relate directly to the ultimate purpose of structural and procedural change in the House of Representatives. They are also compatibly interrelated to provide a consistent and workable whole in the sense that reasonable voters can support the entire proposition. In our judgment it qualifies for submission to the electorate, a holding which should not be interpreted as an indication of our personal views as to the desirability of the changes proposed.

Accordingly, and for the reasons stated, it was ordered that a writ of *mandamus* issue directing the State Board of Elections to certify the proposition for submission at the November 4 election.

*Writ awarded.*

MR. CHIEF JUSTICE GOLDENHERSH, dissenting:

I dissent. The holding of the majority that section 28—1.1 of the Election Code is invalid because the same purpose could have been accomplished by "less drastic means" is based on the fallacious premise that the right to propose a constitutional amendment by means of an initiative is to be equated with the right of suffrage.

None of the cited authorities to which the "less drastic means" test was applied involved the initiative process; they involved the opportunity to vote for a candidate for office. The Nebraska and Arizona cases cited by the

majority are not controlling because they are based upon provisions of the constitutions of those States that are not found in the Constitution of Illinois.

The Arizona Constitution provides:

"Sec. 1. Legislative authority; initiative and referendum

Section 1. (1) [Senate; house of representatives; reservation of power to people] The legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives, but the people reserve the power to propose laws and amendments to the Constitution and to enact or reject such laws and amendments at the polls, independently of the Legislature; and they also reserve, for use at their own option, the power to approve or reject at the polls any Act, or item, section, or part of any Act, of the Legislature.

(2) [Initiative power] The first of these reserved powers is the Initiative. Under this power ten per centum of the qualified electors shall have the right to propose any measure, and fifteen per centum shall have the right to propose any amendment to the Constitution." Ariz. Const. art. 4, sec. 1.

The Nebraska Constitution provides:

"Sec. 2. First power reserved; initiative. The first power reserved by the people is the initiative whereby laws may be enacted and constitutional amendments adopted by the people independently of the Legislature. This power may be invoked by petition wherein the proposed measure shall be set forth at length. If the petition be for the enactment of a law, it shall be signed by seven per cent of the electors of the state and if the petition be for the amendment of the Constitution, the petition therefor shall be signed by ten per cent of such electors. In all cases the electors signing such petition shall be so distributed as to include five per cent of the electors of each of two-fifths of the counties of the state and when thus signed the petition shall be filed with the Secretary of State, who shall submit the measure thus proposed to the electors of the state at the first general election held not less than four months after such petition shall have been filed. The same measure, either in form or in essential substance, shall not be submitted to the people by initiative petition,

either affirmatively or negatively, oftener than once in three years. If conflicting measures submitted to the people at the same election be approved, the one receiving the highest number of affirmative votes shall thereby become law as to all conflicting provisions. The constitutional limitations as to the scope and subject matter of statutes enacted by the Legislature shall apply to those enacted by the initiative." Neb. Const. art. III, sec. 2.

That under the Constitution of this State the right to propose a constitutional amendment by initiative is not to be equated with the right to vote is clearly demonstrated by the explicit language of the Constitution. Article III, section 3, of the Constitution of 1970 provides that "All elections shall be free and equal," and is designed to assure to every citizen the right to vote. In constrast, the method of effecting a change in the legislative article by means of an initiative is very carefully limited. See Ill. Const. 1970, art. XIV, sec. 3.

At the time of the constitutional convention only 13 State constitutions contained provisions for an initiative. (7 Record of Proceedings, Sixth Illinois Constitutional Convention 2299.) The Constitution of 1870 contained no such provision, and constitutional amendment could be commenced only by constitutional convention or legislative proposal. (Ill. Const. 1870, art. XIV, secs. 1, 2.) It is apparent from the constitutional debates that the framers of the 1970 Constitution were acutely aware of the abuse of the initiative in other States and wished to prevent its misuse in Illinois. The discussions show a clear intent to limit the use set forth in article XIV, section 3, and to that end the convention included the requirement that the petitions be signed by 8% of the vote cast in the preceding gubernatorial election. In view of the very restricted provision for use of the initiative, the citation of authorities from Arizona and Nebraska is meaningless.

Assuming, *arguendo,* the relevance of the cases involving the petition requirements to place the name of a

candidate on the ballot, it should be noted that the rationale of the cases in which unusual limitations on those requirements have been held invalid on the ground that the legislative purpose could have been achieved by less drastic means is that in no other manner could the electorate have been presented the opportunity to exercise its right to nominate and elect those persons to office. On the contrary, that condition does not exist with respect to amendments to the Constitution. Article XIV provides that the General Assembly may, at any time, place on the ballot the question whether a constitutional convention should be called. If the question is not submitted during any 20-year period the Secretary of State must submit the question at the general election in the 20th year following the last submission. Further, the electorate, displeased with the failure of its elected representatives to call a convention or to place an amendment on the ballot can demonstrate its displeasure by voting out of office those members of the General Assembly who failed to vote in favor of the amendment allegedly desired by the electorate.

Section 3 of article XIV requires the General Assembly to provide by law "[t]he procedure for determining the validity and sufficiency of a petition ***." We have held repeatedly that whether the course chosen by the General Assembly to achieve a desired result is either wise or the best means available is not a proper subject of judicial inquiry. The majority recognizes that the statewide referendum on what was popularly known as the "Thompson" proposition resulted in a number of individuals being convicted of misconduct in circulating the petitions. The General Assembly, acutely aware of the problem created at that time, apparently sought to forestall its repetition by the enactment of the legislation here under attack. This, it seems to me, falls within the ambit of its constitutional charge to provide by law "[t]he procedure for determining the validity and sufficiency of a petition

\*\*\*." Furthermore, the record shows beyond question that the proponents of the proposal failed to comply with the statute, as amended, not because to do so would have been unduly burdensome but because they had concluded that it was invalid.

MR. JUSTICE RYAN joins in this dissent.

MR. JUSTICE RYAN, also dissenting:

I join in the dissent of the chief justice and also dissent for the additional reason that I am convinced the proposed referendum violates the free and equal elections provisions of the Illinois Constitution, which provides: "All elections shall be free and equal." (Ill. Const. 1970, art. III, sec. 3.) The identical provision was contained in the 1870 Constitution of this State in article II, section 18. In the 1848 Constitution the language was slightly different: "That all elections shall be free and equal." (Ill. Const. 1848, art. XIII, sec. 5.) Similar language was found in the 1818 Constitution. (Ill. Const. 1818, art. VIII, sec. 5.) Thus, the mandate that all elections shall be free and equal has been a fundamental precept of our constitution since statehood was conferred upon Illinois.

This court has construed the free and equal election provisions as requiring that the vote of every qualified elector shall be equal in its influence as that of every other one. (*People ex rel. Breckon v. Board of Election Commissioners* (1906), 221 Ill. 9, 16, *overruled as to other grounds in People ex rel. Lindstrand v. Emmerson* (1929), 333 Ill. 606; *O'Connor v. High School Board of Education* (1919), 288 Ill. 240, 247-48; *Routt v. Barrett* (1947), 396 Ill. 322, 332.) This court has also held that the free and equal elections requirement prohibits the combining of separate unrelated questions into a single proposition for submission to a vote. (*Village of Deerfield v. Rapka* (1973), 54 Ill. 2d 217, 224.) The reason for so holding is that, by combining two unrelated propositions, the voter is

thereby deprived of an opportunity to vote separately and independently on each one. A voter is thereby prevented from giving free and equal expression of preference as to each proposition. (*People ex rel. Toman v. Chicago Great Western R.R. Co.* (1942), 379 Ill. 594, 598; *People ex rel. Hall v. Bopp* (1947), 396 Ill. 80, 83; *Routt v. Barrett* (1947), 396 Ill. 322, 332; *Roll v. Carrollton Community Unit School District No. 1* (1954), 3 Ill. 2d 148, 150.) When two unrelated propositions are combined, a voter desiring to vote for one and against the other is forced to cast his vote partially contrary to his preference and therefore does not have an equal opportunity or equal influence with the voter who either favors or opposes both propositions. (*O'Connor v. High School Board of Education* (1919), 288 Ill. 240, 248; *Village of Deerfield v. Rapka* (1973), 54 Ill. 2d 217.) In *Craig v. Peterson* (1968), 39 Ill. 2d 191, this court synthesized the meaning of free and equal elections as contained in our constitution from its previous decisions, and stated:

> " 'The constitutional guarantee gives to every qualified voter the free exercise of his right to cast his vote without suffering any restraint; and his vote, when cast, shall have the same influence as the vote of any other voter' \*\*\* 'Elections are equal when the vote of each voter is equal in its influence upon the result to the vote of every other elector—where each ballot is as effective as every other ballot.' " (*Craig v. Peterson* (1968), 39 Ill. 2d 191, 195, quoting *People v. Deatherage* (1948), 401 Ill. 25, 37, and *Moran v. Bowley* (1932), 347 Ill. 148, 162-63.

See also *People ex rel. Lindstrand v. Emmerson* (1929), 333 Ill. 606; *People v. Fox* (1920), 294 Ill. 263; *People ex rel. Grinnell v. Hoffman* (1886), 116 Ill. 587.

In this State this court has effected the prohibition against submitting to the electorate multiple propositions

on one referendum through the construction of our free and equal constitutional provisions. Several States have provisions in their constitutions specifically requiring that multiple propositions be submitted in such a manner that the voters may vote for or against each proposition separately. In construing this requirement of their constitutions, the courts in those States have recognized another evil found in the submission of multiple propositions in one referendum. This evil is generally referred to as "logrolling," which practice, by including in one referendum several unrelated propositions, induces the voters who favor one proposition to vote for all. The result is that through the cumulative favorable votes on all of the propositions some otherwise doubtful propositions are adopted. (*Kerby v. Luhrs* (1934), 44 Ariz. 208, 36 P.2d 549; *Hood v. State* (1975), 24 Ariz. App. 457, 539 P.2d 931; *Schmitz v. Younger* (1978), 21 Cal. 3d 90, 93, 577 P.2d 652, 653, 145 Cal. Rptr. 517, 518 (Manuel, J., dissenting); *Amador Valley Joint Union High School District v. State Board of Equalization* (1978), 22 Cal. 3d 208, 583 P.2d 1281, 149 Cal. Rptr. 239; *State ex rel. City of Fargo v. Wetz* (1918), 40 N.D. 299, 168 N.W. 835.) In *Kerby v. Luhrs,* the Arizona Supreme Court has exhaustively analyzed the cases from other jurisdictions on this subject.

This court, without specifically referring to the free and equal elections provisions of the constitution, in an early case condemned the evils of logrolling inherent in submitting unrelated propositions together in one referendum so as to secure a favorable vote on all. In *Board of Supervisors v. Mississippi & Wabash R.R. Co.* (1859), 21 Ill. 333, 373, this court stated:

"All elections, as well for measures as men, should be perfectly free, uninfluenced by any consideration, other than the merits of the individual man or measure proposed. We boast of the freedom of the

elective franchise, should we not strive to swell the boast by its purity also? A single, isolated measure, such as a railroad, may not unite a majority of a county to whom it is proposed. It may favor, if constructed, one portion of a county more than another, and thereby be prevented from receiving a clear majority vote, such as the law clearly contemplates shall be given. Is it fair, in order to accomplish this object, to attach another measure to it, to be voted on at the same time, which may benefit the opposing portion of the county? The law never intended that two roads should be coupled together, and the people forbidden to vote for one if they did not also vote for the other, the one road being really a bribe offered for votes for the other. The truth is, the voters of Fulton have never had an opportunity to vote, and never have voted this subscription, for the question was at no time distinctly before them. The question before them was, will you vote for a subscription to two roads? Neither road has received the approving vote of the people, and until that is done, until the naked single question shall be fairly presented to those voters, they ought not to be bound, or injuriously affected, by any such jockeying management and log-rolling. ***

This tacking one measure upon another, is unjust in another view, as it gives the County Court power to weigh down a popular single measure, by attaching odious measures to it, and thus virtually depriving the people of their right to vote on the one measure, the success of which would greatly promote their interests."

In spite of the condemnation by this court and the courts of other jurisdictions of the practice of submitting multiple propositions in one referendum, it must be admit-

ted that, as a practical matter, absolute purity in this regard is not required and indeed in many instances would be impossible. There are few propositions that do not involve incidental questions which will be approved or rejected by voting on the principal issue. The question then becomes one of how to differentiate between the joinder of questions that are constitutionally permissible from the joinder of those that violate the free and equal election requirement of our constitution.

Regardless of the contention of the respondents that there are three separate questions present in our case, as discussed in the majority opinion, I view the proposition as presenting two separate and unrelated questions. The explanation of the proposed amendment, as contained in the form of ballot set out in the official publication of the Secretary of State mailed to the voters, states:

> "The purpose of the Amendment is to reduce the size of the House of Representatives from 177 to 118 members and to provide for the election of one Representative from each of 118 districts." (Office of the Secretary of State, Amendments To The Constitution of Illinois That Will Be Submitted To The Voters November 4, 1980, at 8.)

Providing for the election of one representative from each of 118 districts would abolish cumulative voting as is now provided in article IV, section 2(b), of the Constitution of 1970. There are then two questions presented by the referendum: (1) shall the House of Representatives be reduced from 177 to 118 members and (2) shall cumulative voting for members of the House of Representatives be abolished.

The majority opinion states that separate questions may be combined in a single proposition as long as they are reasonably related to a common objective in a workable manner. I fail to see how the two questions we are considering are reasonably related to a common objective. The majority deviates from this test later in the opinion when it states:

"If there is a reasonable, workable relationship to the same subject, the proposal may be submitted for approval or rejection by the voters." (83 Ill. 2d at 258.)

Frankly, I do not know what that statement means. I have never seen that test stated in any case concerning the submission of multiple questions in one proposition. The opinion appears to attribute this test to the opinion of the Supreme Court of Arizona in *State ex rel. Jones v. Lockhart* (1953), 76 Ariz. 390, 265 P.2d 447. However, *Lockhart* does not support the conclusion drawn by the majority of this court.

It is not enough to state the general language used in *Lockhart*—"relate to and are germane to, one general subject"—to understand the holding of that case. (76 Ariz. 390, 397, 265 P.2d 447, 452.) *Lockhart* does not support the general proposition that as long as two questions are germane to and relate to one general subject they may be submitted in one proposition. To understand the holding of *Lockhart* we must consider the reason behind the general language used. The Arizona Supreme Court in that case, in explaining why the proposed amendment did not violate the multiple question prohibition of that State's constitution, stated that, at all times since statehood, the provisions governing the composition and apportionment of the two houses of their legislature had been consolidated into a single subsection of their constitution. While the size and apportionment of the House had at previous times been changed by amendment, the size of the Senate had remained the same. Although the amendment in question in that case was the first time that there had been a change in the number of senators elected from each county, each previous amendment had amended the entire section just as much as if it had changed the number of senators. The court was explaining that the subject matter of the question in the amendment had always been treated as a unit,

as one subject. The language relied upon by the majority of our court: "[c]learly both relate to, and are germane to, one general subject, *i.e.,* the composition of the state legislature" (83 Ill. 2d at 256), must therefore take its meaning from the Arizona court's discussion in *Lockhart.* It is not enough that the several questions simply be germane to or related to one *general subject.*

The majority opinion seems to feel that *Lockhart* overruled, or somehow superseded (the language used is "controls") (83 Ill. 2d at 257) the previous holding of the Arizona Supreme Court in *Kerby v. Luhrs* (1934), 44 Ariz. 208, 36 P.2d 549. That is not the case. In fact, the court in *Lockhart* affirmed the holding of *Kerby* and stated that the court in *Kerby* had "laid down the yardstick to be used in determining what matters fall within the ban of the constitutional provision." (*State ex rel. Jones v. Lockhart* (1953), 76 Ariz. 390, 396, 265 P.2d 447, 451.) The court then quoted extensively the "yardstick" as laid down in *Kerby:*

"If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition." (*State ex rel. Jones v. Lockhart* (1953), 76 Ariz. 390, 396, 265 P.2d 447, 451.)

The *Lockhart* court then noted that in *Kerby* it had rejected the contention that the three questions could be combined into one proposition because they all fall under the general heading of taxation.

Thus, it is not enough that the questions combined related to one general subject in a general way. According to the yardstick of *Kerby,* approved and applied in *Lockhart*, the questions relating to the same general subject matter must be such that, "logically speaking, they should stand or fall as a whole." (*Kerby v. Luhrs* (1934), 44 Ariz. 208, 221, 36 P.2d 549, 554.) If one question "is not such that the voter supporting it would reasonably be expected to support the principle of the others" (*Kerby v. Luhrs* (1934), 44 Ariz. 208, 221, 36 P.2d 549, 554), then they are in reality two or more amendments. Therefore, the test of *Kerby,* which the majority of our court refuses to apply because of *Lockhart,* is still the law in Arizona. Also, contrary to the belief expressed in our majority opinion, *Lockhart,* applying these tests, could not approve the proposal before us.

The majority opinion's reliance on *Amador Valley Joint Union High School District v. State Board of Equalization* (1978), 22 Cal. 3d 208, 583 P.2d 1281, 149 Cal. Rptr. 239, is also misplaced. In considering the several separate questions combined in the famous "Proposition 13," the court applied a dual test. The first part the court took from its earlier holding in *Perry v. Jordan* (1949), 34 Cal. 2d 87, 207 P.2d 47, which the court referred to as the "reasonably germane" test. The language the court quoted from *Perry* shows that the "reasonably germane" test does not permit a broad general relationship to a general subject, but requires that the numerous questions presented in one proposition must have one general object and must be so related and interdependent as to constitute a single scheme. *Amador Valley Joint Union High School District v. State Board of Equalization* (1978), 22 Cal. 3d 208,

230, 583 P.2d 1281, 1290, 149 Cal. Rptr. 239, 248.

The second part of the test applied by the California court was taken from Mr. Justice Manuel's dissent in *Schmitz v. Younger* (1978), 21 Cal. 3d 90, 100, 577 P.2d 652, 657-58, 145 Cal. Rptr. 517, 522-23, which requires that the various questions, to avoid the multiple-question proscription of the California constitution, must be "functionally related in furtherance of a common underlying purpose." (*Amador Valley Joint Union High School District v. State Board of Equalization* (1978), 22 Cal. 3d 208, 230, 583 P.2d 1281, 1290, 149 Cal. Rptr. 239, 248.) The California court then held that the proposition in question satisfied both tests in that "the several elements of that article satisfy either standard in that they are both reasonably germane to, *and* functionally related in furtherance of, a *common underlying purpose,* namely, effective real property tax relief." (Emphasis added.) *Amador Valley Joint Union High School District v. State Board of Equalization* (1978), 22 Cal. 3d 208, 230, 583 P.2d 1281, 1290, 149 Cal. Rptr. 239, 248.

The two separate questions combined into the one proposition which we are now considering do not meet either facet of the test applied by the California court. Our two questions can only be said to be germane in that both relate or pertain to the House of Representatives of our General Assembly. The two questions do not have *one general object,* because the object of one is to reduce the size of the House of Representatives, while the object of the other is to abolish cumulative voting. Also, the two questions are not *so related and interdependent* as to constitute a single scheme. Obviously, there is no common scheme underlying the two questions. Also, they are not related or interdependent. The size of the House can easily be reduced without abolishing cumulative voting by reducing the number of House districts to a number which, when multiplied by three, gives the desired number of

members of the House of Representatives. House districts and Senate districts need not coincide. Also, cumulative voting can be abolished without reducing the size of the House of Representatives or changing the number of districts from which the members are elected by simply electing three representatives from each district without the benefit of the cumulative vote.

The language quoted by the majority opinion in our case from *Carter v. Burson* (1973), 230 Ga. 511, 198 S.E.2d 151, also does not support the opinion of this court because that case also holds that all parts of the amendment must be germane to the accomplishment of a single objective. Likewise, the language of the Louisiana case *State ex rel. Kemp v. City of Baton Rouge* (1949), 215 La. 315, 40 So. 2d 477, requires that the proposed amendment be considered as a plan of government and that the several subjects must be germane to the general purpose of the amendment. As noted above, there are two general purposes involved in the proposition we are now considering, each unrelated and not interdependent.

We need not go to other jurisdictions to find support for the position for which I contend. In *People ex rel. Hall v. Bopp* (1947), 396 Ill. 80, 83, this court said:

"The constitutional provision circumscribes the power of the General Assembly and prohibits it from prescribing a form of ballot which combines two or more *separate unrelated* propositions into a single question." (Emphasis added.)

This court went on to say in *Bopp* that separate questions which are incidental to and form an integral part of the main question to be submitted to the voters need not be submitted separately. (*People ex rel. Hall v. Bopp* (1947), 396 Ill. 80, 84.) The same "separate and unrelated" and "incidental to" tests were applied in *Routt v. Barrett* (1947), 396 Ill. 322, 332-33. In *Village of Deerfield v. Rapka* (1973), 54 Ill. 2d 217, 224, the court also applied

the "separate and unrelated" test. In *Roll v. Carrollton Community Unit School District No. 1* (1954), 3 Ill. 2d 148, 151, this court found that the single proposition submitted to the voters had but one general purpose, namely, to meet the building needs of the school district as a whole and that the proposals included in the single proposition "are substantially connected to and related to each other in nature to satisfy the constitutional provision." In *Solomon v. North Shore Sanitary District* (1971), 48 Ill. 2d 309, 318, the court found that the several separate construction projects submitted for approval on ballot did not violate the constitutional proscription because they were "related and dependent and are components of one proposition." In *Voss v. Chicago Park District* (1946), 392 Ill. 429, 434, the court stated "the object designated on the ballot indicates a single general purpose ***."

The word "germane," as used by this court in applying the constitutional provision now under consideration, appears to be related to the use of that word by this court in cases which considered the provisions of the 1870 Constitution which prohibited an act of the legislature from embracing more than one subject and which required that subject to be expressed in the title (Ill. Const. 1870, art. IV, sec. 13). In *Dolese v. Pierce* (1888), 124 Ill. 140, this court gave meaning to the word "germane" in applying the prohibitions of article IV, section 13, of the Constitution of 1870, and stated:

"It is said, however, that legislation affecting the boundaries of cities and villages is germane to that affecting the boundaries of townships. But counsel have failed to tell us in what way or sense the one is germane to the other, or what meaning they attach to that term in giving a construction to the provision of the constitution in question. Literally, 'germane' means 'akin,' 'closely allied.' It is only applicable to persons who are united to each

other by the common tie of blood or marriage. When applied to inanimate things, it is, of course, used in a metaphorical sense, but still the idea of a common tie is always present. Thus, when properly applied to a legislative provision, the common tie is found in the tendency of the provision to promote the object and purpose of the act to which it belongs. Any provision not having this tendency, which introduces new subject matter into the act, is clearly obnoxious to the constitutional provision in question." (*Dolese v. Pierce* (1888), 124 Ill. 140, 147.)

This court restated this definition of "germane" in *Sutter v. People's Gas Light & Coke Co.* (1918), 284 Ill. 634, 643. In *Campe v. Cermak* (1928), 330 Ill. 463, in considering a statute challenged as being in violation of article IV, section 13, of the Constitution of 1870, the court said:

"If the particulars are incidental or germane to the general title or main purpose and show a furtherance of the one scheme or purpose of the act, the title is single and the act embracing the same general subject and particulars is valid." *Campe v. Cermak* (1928), 330 Ill. 463, 468.

The majority opinion in our case pays lip service to the "separate and unrelated" test and to the "germane" test. However, in doing so it retreats from the separate purpose of each question on the ballot until it is able to find some common denominator. As stated in the opinion, that common denominator is that "they relate directly to the ultimate purpose of *structural and procedural* change in the House of Representatives." (Emphasis added.) (83 Ill. 2d at 260.) That is about as broad a statement of a common purpose as one can make because that encompasses the entire area concerning the House of Representatives which is subject to change by a constitutional amendment brought about by initiative. Article XIV, section 3, of the Constitu-

tion of 1970 limits constitutional amendments submitted in this manner to "structural and procedural" subjects contained in article IV. What the majority opinion seems to say is that any and all constitutional changes of either House of the General Assembly authorized under article XIV, section 3, can be submitted on one ballot regardless of how many questions may be involved or what "structural and procedural" changes they propose. I do not agree. There is nothing in article XIV, section 3, of our constitution which even intimates that the "free and equal elections" provision of article III, section 3, of our constitution shall not apply. Likewise, article III, section 3, does not so indicate.

This construction given to article III, section 3, simply renders it meaningless. The observation of the Arizona court in *Kerby v. Luhrs* is particularly appropriate:

"An entire Code of laws cannot be embodied in an amendment to the constitution merely because said laws pertain to 'one object or purpose.' " (*Kerby v. Luhrs* (1934), 44 Ariz. 208, 218, 36 P.2d 549, 553.)

I must also agree with the statement of Mr. Justice Manuel of California in his dissent in *Schmitz v. Younger* (1978), 21 Cal. 3d 90, 101, 577 P.2d 652, 658, 145 Cal. Rptr. 512, 523:

"[I]f the broad umbrella of 'educational reform' can embrace such diverse and unrelated subjects as are presented here, then the one subject limitation becomes meaningless."

It is again appropriate to refer to the language of this court in *Dolese v. Pierce:*

"It is an error to suppose that two things are, in a legal sense, germane to each other merely because there is a resemblance between them, or because they have some characteristics common to them both. One might, with just as much reason, con-

tend that two persons are necessarily akin because they are of the same complexion, or in other particulars alike." *Dolese v. Pierce* (1888), 124 Ill. 140, 147.

The majority opinion, although referring to and quoting from many of the same cases to which I have referred in this dissent, does not apply the law as stated in those cases, which requires more than just some vague general connection between two questions submitted under one proposition.

The majority opinion simply holds that since both questions we are considering relate to the types of amendments authorized under article XIV, section 3, of our constitution, they can be combined into one proposition on the ballot. This is a dangerous construction and will surely lead to a deprivation of the right of voters to express themselves separately on unrelated questions. Voters' influence and the weight of their votes will no longer be equal, and logrolling to achieve adoption of undesirable issues will be encouraged. I must, therefore, respectfully dissent.

MR. CHIEF JUSTICE GOLDENHERSH joins in this dissent.